LOCAL 553, TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, Plaintiff-Appellee,

v.

EASTERN AIR LINES, INC., Defendant-Appellant.

No. 423, Docket 82–7622.

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1982.

Decided Dec. 17, 1982.

As Amended Feb. 1, 1983.

Stanley Futterman, New York City (Carmel P. Ebb, Poletti Freidin Prashker Feldman & Gartner, New York City, on the brief), for defendant-appellant.

Victor Rabinowitz, New York City (Katherine Stone, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, on the brief), for plaintiff-appellee.

Before MANSFIELD, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

This case presents numerous issues that arise when a District Court orders preliminary injunctive relief in a labor dispute arising under the Railway Labor Act (RLA). 45 U.S.C. §§ 151–188 (1976 & Supp. IV 1980). In an August 16, 1982, decision, 544 F.Supp. 1315, the District Court for the Eastern District of New York (Charles P. Sifton, Judge) granted the motion of plaintiff-appellee Local 553, Transport Workers Union of America, AFL–CIO, for preliminary injunctive relief pending the Court's adjudication of the merits of the union's claim that defendant-appellant Eastern Air Lines had violated the Railway Labor Act by assigning non-union flight attendants to certain newly acquired South American routes. After determining that Local 553 was likely to succeed on the merits of its claim and that the use of non-union flight attendants would cause the union irreparable harm pending the outcome of the litigation, the District Court preliminarily ordered Eastern to take actions designed to alleviate the irreparable harm to the union. We conclude that the District Court acted within its discretion in determining that some preliminary relief was warranted. We further conclude that neither section 7 nor section 8 of the Norris-LaGuardia Act, 29 U.S.C. §§ 107, 108 (1976), presents a bar to injunctive relief in this case. However, we do not approve the form of relief that was ordered and therefore modify the terms of the injunction.

I

On April 22, 1982, Eastern informed Local 553 that the airline might purchase a system of South American routes from financially troubled Braniff Airlines. Eastern told the union that, if the purchase went through, the company would be obliged by the law of several South American countries to retain Braniff's South American flight attendants who were nationals of those countries. From the start, the union opposed the hiring of foreign flight attendants who would not be covered by the union contract and who would be paid substantially lower wages than union members. Notwithstanding the union's opposition, on April 26 the two airlines signed an agreement under which Eastern would acquire the Braniff routes and employ approximately 340 former Braniff flight attendants from Peru, Panama, Colombia, Argentina, and Chile. The Civil Aeronautics Board approved the agreement on April 27, and Eastern planned to begin flying the routes on June 1. But when Braniff filed for bankruptcy on May 13, Eastern was forced to accelerate its plans and began flying the routes on May 14. The former Braniff flight attendants were assigned to

roughly half of the positions on these new Eastern flights.[1]

This dispute over the hiring of Braniff's flight attendants occurred while Eastern and Local 553 were in the midst of renegotiating their collective bargaining agreement. The previous Eastern-Local 553 agreement had expired on March 31, 1982, after each side had given notice more than sixty days earlier that it wanted to change certain terms of the agreement. *See* Agreement Between Eastern Air Lines, Inc. and the Transport Workers Union of America, Local 553, § 33 (Feb. 29, 1980) [hereinafter cited as Eastern-Local 553 agreement]. Under the RLA, Eastern was obliged to maintain the rates of pay, rules, and working conditions of the previous agreement while the parties attempted to negotiate a new contract. *See* RLA § 6, 45 U.S.C. § 156 (1976).

Between April 22 and May 27, Eastern and Local 553 met repeatedly to resolve the dispute caused by the company's hiring the Braniff flight attendants. A variety of compromises were discussed, and these discussions occasionally merged with the ongoing bargaining over the new collective bargaining agreement. But when Braniff's sudden bankruptcy forced Eastern to assume the South American routes on May 14, the discussions faltered. On May 19, the union filed a grievance demanding that Braniff attendants be removed from the South American flights. That grievance was denied by the company and was then referred to the Eastern Air Lines Flight Attendants' System Board of Adjustment for resolution. In the meantime, on May 28, the union filed this lawsuit to enjoin the company from assigning the Braniff flight attendants to the South American routes. Once the suit was filed, the company and the union suspended their efforts to resolve the matter at the bargaining table. The grievance proceeding is still pending before the Adjustment Board.

At the crux of this dispute is the scope clause of the Eastern-Local 553 agreement, section 2(A)(1), which reads:

It is agreed that any and all flying, performed in or for the service of Eastern Air Lines, Inc., will be performed by Flight Attendants whose names appear on the then current Eastern Airlines system seniority list.

According to the union's amended complaint, this scope clause gives Local 553 members the exclusive right to staff all Eastern flights, both domestic and foreign. The company, it was alleged, changed the "rates of pay, rules, or working conditions" of the union flight attendants when it assigned Braniff attendants to the South American routes, thereby violating the status quo requirements of section 6 of the Act, 45 U.S.C. § 156, and precipitating a "major dispute" under section 2, Seventh, of the RLA, 45 U.S.C. § 152, Seventh. Accordingly, the union contended that the District Court had authority to enjoin the company's action. Eastern contended that the contract did not assure Local 553 members the right to bid for flying to be performed by foreign flight attendants based abroad and that the issue was sufficiently in doubt to be only a "minor dispute," that is, a dispute "arising out of . . . the interpretation or application of agreements concerning rates of pay, rules, or working conditions." RLA § 2, Sixth, 45 U.S.C. § 152, Sixth.

The District Court denied the union's request for a temporary restraining order, primarily because Eastern's hiring of the Braniff flight attendants did not constitute an immediate and irreparable harm for Local 553. Shortly after this denial, the union moved for a preliminary injunction. On August 16, after conducting eight days of hearings, the District Court issued its decision in favor of the union. The Court ruled that the union had shown a probability of success on its claim that Eastern had changed working conditions by not awarding all the Braniff routes to Local 553 members and thereby had precipitated a major dispute. The Court's preliminary injunc-

---

1. The former Braniff flight attendants shared with Local 553 members the segments of the new Eastern flights between the United States and South America. The Braniff flight attendants did all the flying within South America.

tion, as subsequently clarified at a conference with counsel, ordered Eastern to permit Local 553 members to bid for the highly paid South American routes on the basis of seniority. The company then had a choice whether to let the successful bidders fly these routes or to ground the successful bidders and create an escrow fund from which they would be paid the wages they would have earned by flying these routes, such payment to be made only if the union prevailed in the litigation. Eastern chose the latter option. The District Court had included the option of having the successful bidders for the South American routes fly no routes in order to assure other attendants the opportunity to move up to the routes to which their seniority entitled them once the more senior attendants vacated their second choice routes by successfully bidding for the South American routes as their first choice.

At oral argument on this appeal, we stayed the preliminary injunction, conditioned upon Eastern's adoption of a modified bidding procedure starting in October, which eliminated the prospect of flight attendants drawing pay for not working.[2] Under the modified procedure, which combines an actual bid system with a "paper bid" system, Eastern makes the South American routes available for the normal monthly bidding, but notifies the union membership that the senior attendants who "win" these routes will not fly them. Instead, they will be awarded and assigned to fly their next available preference. Similarly, many other attendants are awarded a route one step lower on each attendant's list of preferences compared to the routes each would have flown if the senior attendants had flown the South American routes. This modified procedure not only avoids keeping

2. Our order granting the stay read as follows:

It Is HEREBY ORDERED that the motion of Defendant-Appellant Eastern Air Lines, Inc. ("Eastern") for a stay of the preliminary injunction issued by the United States District Court for the Eastern District of New York (Sifton, J.) on August 16, 1982, and modified on August 20, 1982, is granted, pending disposition of the appeal herein, on the following conditions:

It is ORDERED that pending disposition of said appeal Eastern shall make available all flying to occur on or after October 1, 1982, over its routes acquired from Braniff Airways, Inc., including flying actually allocated to bases on such routes outside the United States, for bid by flight attendants based in the United States, including flight attendants on leave at the bases to which that flying is allocated, as well as make available flying to occur on or after October 1, 1982, which is actually allocated to Eastern flight attendant bases in the United States for bid and actual award to flight attendants based in the United States; said bidding procedures shall be conducted in a manner that gives clear notice to flight attendants based in the United States (a) that bids for flying lines awarded to flight attendants based outside the United States will not result in actual awards of such flying to flight attendants based in the United States, (b) that unless flight attendants based in the United States who bid for flying actually awarded to flight attendants based outside the United States accept flying assignments pursuant to the next preference for which they are eligible, they will be deemed to have waived any claim to compensation for flights awarded to attendants based outside the United States, and (c) that

the purpose of permitting flight attendants based in the United States to bid on flying actually awarded to flight attendants based outside the United States is to make it possible at the conclusion of the action, if necessary, to determine the difference between the compensation actually received by all flight attendants based in the United States and the compensation each of those flight attendants would have received if all of the flying over Braniff's routes had actually been allocated to bases in the United States which would have permitted an upgrading of all awards to flight attendants based in the United States; and

It Is FURTHER ORDERED that this Order shall be prospective only in its operation, is without prejudice to the parties' enforcement of rights accrued under the preliminary injunction and shall not affect Eastern's obligation under said preliminary injunction to place in escrow, for the period up to and including September 30, 1982, the salaries of United States-based flight attendants who had been awarded, pursuant to said preliminary injunction, flying actually allocated to bases outside of the United States; and

It Is FURTHER ORDERED that Eastern shall, on or before September 27, 1982, deliver to this Court and to the Union a copy of the form of bid and notice to be used pursuant to this Order and, beginning on October 1, 1982, furnish to the Union copies of awards made with respect to all flight assignments covered by this Order; and

It Is FURTHER ORDERED that decision is reserved on all other issues raised by the appeal herein.

senior attendants at home but also creates a record from which calculations can be made to determine which routes each attendant would have flown and the extra wages each attendant would have earned if the South American routes had been awarded to the senior attendants. These sums are to be paid if the union prevails in the litigation.

## II

The fundamental issue raised by this suit is whether the controversy between Eastern and Local 553 is a major or minor dispute under the RLA. We note at the outset that, although the distinction between major and minor disputes is central to the RLA, that distinction is imprecise and has plagued courts and commentators over the years. *See Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 722–28, 65 S.Ct. 1282, 1289–1292, 89 L.Ed. 1886 (1945); *Rutland Railway Corp. v. Brotherhood of Locomotive Engineers,* 307 F.2d 21, 30–37 (2d Cir.1962), *cert. denied,* 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963); McGuinn, *Injunctive Powers of the Federal Courts in Cases Involving Disputes Under the Railway Labor Act,* 50 Geo.L.J. 46, 55–73 (1961); Comment, *Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes,* 60 Colum.L.Rev. 381, 394–96 (1960).

The Railway Labor Act does not use the terms "major" and "minor" to distinguish disputes. That terminology was coined by the Supreme Court when it interpreted the Act in *Elgin, Joliet & Eastern Railway Co. v. Burley, supra,* 325 U.S. at 722–28, 65 S.Ct. at 1289–1292. There, the Court found that the distinction was a traditional one in the railway industry. *Id.* at 723, 65 S.Ct. at 1289–1290. Major disputes involved the formation or alteration of agreements; they dealt with the prospective acquisition of rights. Minor disputes in contrast pre-

supposed the existence of an agreement; they turned on the application of an agreement's terms and thus dealt with rights previously accrued. *Id.*

While the *Elgin* formulation may have been adequate when unions were organizing for the first time and entering into their first collectively bargained agreements, it became less helpful as management and labor increasingly renegotiated existing agreements. When a carrier took actions that were of questionable validity under the existing agreement, courts were hard-pressed to determine whether the carrier had changed the conditions of work or simply infringed upon a right guaranteed the union under the agreement. *See* Comment, *supra.* To resolve this dilemma, courts have looked to the collective bargaining agreement to determine whether a plausible interpretation would justify the carrier's action. *E.g., Rutland Railway Corp. v. Brotherhood of Locomotive Engineers, supra,* 307 F.2d at 36. A dispute is major if the carrier's contractual justification for its actions is "obviously insubstantial." *See, e.g., United Transportation Union v. Penn Central Transportation Co.,* 505 F.2d 542, 544 & n. 5 (3d Cir.1974) (per curiam); *Airlines Stewards & Stewardesses Ass'n, Local 550 v. Caribbean Atlantic Airlines, Inc.,* 412 F.2d 289, 291 (1st Cir.1969). On the other hand, a dispute is minor if the contract is "reasonably susceptible" to the carrier's interpretation. *See Southern Pacific Transportation Co. v. United Transportation Union,* 491 F.2d 830, 833 (9th Cir.), *cert. denied,* 416 U.S. 985, 94 S.Ct. 2389, 40 L.Ed.2d 762 (1974); *United Transportation Union v. Burlington Northern, Inc.,* 458 F.2d 354, 357 (8th Cir.1972).[3]

Perhaps because of the difficulties that arise in determining whether an agreement arguably supports a carrier's actions, the Supreme Court has occasionally taken a

---

**3.** Even these more recent formulations are not entirely satisfactory, particularly when courts are interpreting agreements that include general management rights clauses, which arguably can be enlisted to support any action taken by management that is not explicitly in conflict with a contractual right of the union. *See*

*Missouri-Kansas-Texas Railroad Co. v. Brotherhood of Locomotive Engineers,* 266 F.2d 335, 340 (5th Cir.1959), *rev'd,* 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1435 (1960); *Rutland Railway Corp. v. Brotherhood of Locomotive Engineers, supra,* 307 F.2d at 36.

more pragmatic approach to decide, in close cases, whether a dispute is major or minor. In *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), the Court focused on the extent of the disruption caused by the carrier's action; in a literal sense, it looked to see whether the dispute was major. Such an approach was anticipated by this Circuit in *Rutland Railway,* which noted that *Order of Railroad Telegraphers v. Chicago & North Western Railway Co.,* 362 U.S. 330, 341, 80 S.Ct. 761, 767, 4 L.Ed.2d 774 (1960), may have "add[ed] a new dimension to the usual criteria for distinguishing major disputes from minor ones, that of the magnitude of the effect on working conditions which would result from the proposal." 307 F.2d at 36. Tying the type of dispute to its significance is consistent with the Supreme Court's initial interpretation of this aspect of the RLA. In *Elgin,* the Court noted that Congress created the major dispute process for "the large issues about which strikes ordinarily arise," while the compulsory arbitration of section 3 was reserved for minor disputes "[b]ecause of their comparatively minor character and the general improbability of their causing interruption of peaceful relations and of traffic." 325 U.S. at 723–24, 65 S.Ct. at 1289–1290.

The distinction between major and minor disputes has important consequences as to both administrative procedures for dispute resolution and district court authority to intervene. If a carrier proposes to take action that changes an agreement, thereby precipitating a major dispute, it must first give a union notice, RLA § 6, 45 U.S.C. § 156, and then engage in the prolonged mediation process prescribed by the Act, *see* RLA § 2, Seventh, 45 U.S.C. § 152, Seventh.[4] The mediation process for major disputes includes the imposition of a duty on both parties to make "reasonable efforts" to settle, assistance from the National Mediation Board, voluntary recourse to arbitration, and finally, in some cases, re-

sort to a Presidential Emergency Board. *See Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, supra,* 396 U.S. at 150–151, 90 S.Ct. at 299–300. Although none of these processes guarantees resolution of the dispute, the Act requires that both parties maintain the status quo while the mediation process runs its course, *see* RLA, §§ 5, First, 6, 10, 45 U.S.C. §§ 155, First, 156, 160, and either side of a labor dispute can resort to the federal courts to enjoin the other side from violating these status quo provisions. *See Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, supra,* 396 U.S. at 153–54, 90 S.Ct. at 301 (enjoining carrier from changing work conditions while mediation underway); *United Industrial Workers v. Board of Trustees,* 351 F.2d 183, 189–92 (5th Cir.1965) (same); *Louisville & Nashville Railroad Co. v. Bass,* 328 F.Supp. 732, 744–46 (W.D.Ky.1971) (enjoining strike while mediation of major dispute in process); *cf. Chicago & North Western Railway Co. v. United Transportation Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971) (court may enjoin strike by union that has not engaged in reasonable efforts during major dispute resolution procedures). The purpose of the statutorily imposed cooling-off period is to give the parties enough time to conduct calm negotiations and resolve their differences before they resort to self-help and cause disruptions of interstate commerce. *See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 377–80, 89 S.Ct. 1109, 1114–1116, 22 L.Ed.2d 344 (1969). Once the parties have exhausted the Act's mediation process, however, either may resort to self-help by unilaterally changing working conditions or striking, as the case may be.

If a carrier proposes to take action arguably permitted by the contract, opposition by the union based on a differing interpretation of the contract is a minor dispute subject to binding adjudication by the

4. The notice that the company gave the union prior to the expiration of the 1980 agreement on March 31, 1982, did not cover the hiring of

non-union flight attendants to serve on foreign flights.

appropriate Adjustment Board, which can interpret contract clauses and award monetary damages. RLA § 3, First, 45 U.S.C. § 153, First; *see* RLA § 204, 45 U.S.C. § 184. Compulsory resolution of minor disputes was added to the RLA by amendment in 1934 with the support of organized labor, which previously had resisted any legislatively imposed compulsory determination of labor disputes. *See* Hearings on H.R. 7650 Before the House Comm. on Interstate Commerce, 73d Cong., 2d Sess. 47 (1934) (testimony of Coordinator Eastman). As a result of the 1934 amendments, the RLA for the first time offered a means of resolving technical disputes between labor and management without the risk of strike or work stoppages or prolonged litigation. *See Elgin, Joliet & Eastern Railway Co. v. Burley, supra,* 325 U.S. at 722–28, 65 S.Ct. at 1289–1292. Since the Adjustment Board has exclusive jurisdiction to resolve minor disputes under the RLA, courts may not adjudicate the merits of these issues; the judiciary can, however, take action to preserve a minor dispute for the Adjustment Board. In particular, district courts can enjoin strikes that threaten to undermine the Adjustment Board's jurisdiction. *See, e.g., Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 39–42, 77 S.Ct. 635, 639–640, 641, 1 L.Ed.2d 622 (1957). In contrast, however, courts have been reluctant to enjoin carriers from actions that may have given rise to the minor dispute because the Act calls for the Adjustment Board to determine whether the carrier's action was permissible under the governing contract. *See United Transportation Union v. Penn Central Transportation Co., supra,* 505 F.2d at 545. Nevertheless, there have been instances in which the Supreme Court has authorized injunctions issued against carrier action when the injunction "rather than defeating the Board's jurisdiction, would operate to preserve that jurisdiction

by preventing injury so irreparable that a decision of the Board in the unions' favor would be but an empty victory." *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co.,* 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1435 (1960); *see Westchester Lodge 2186 v. Railway Express Agency,* 329 F.2d 748, 752–53 (2d Cir.1964).

Thus, whether the dispute is determined to be major or minor significantly alters the standards that govern a district court's issuance of an injunction to preserve the status quo. If the dispute is major, the status quo is normally to be preserved pending the mediation process, but if the dispute is minor, a status quo injunction is appropriate only in those instances when it appears that its absence would prevent the Adjustment Board from giving a significant remedy to the side that prevails before the Board.

### III

On this appeal, Eastern first asserts that the District Court issued its injunction in violation of this Circuit's standard for awarding preliminary relief.[5] Eastern contends that the District Court erred in finding the union likely to prevail on the merits of the suit. Moreover, the company argues that the District Court incorrectly found that, absent preliminary relief, the union would suffer irreparable harm.

### A

Considering first the likelihood of success on the merits, we conclude that the District Court was acting within permissible bounds of discretion when it determined that Local 553 was likely to prevail on the merits of this case. The District Court's analysis of whether the dispute in this case was major or minor focused on the collective bargaining agreement and, in particular, section 2(A)(1), the scope clause. Section 2(A)(1) states that "any and all flying" should be

---

**5.** Preliminary injunctive relief in this Circuit requires a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 758 (2d Cir.1979).

performed by attendants on Eastern's seniority list, and the District Court interpreted the clause to "prohibit[ ] the use of any flight attendant who is not on the current seniority list." The Court reasoned that since Eastern's assignment of the South American routes to the Braniff flight attendants was inconsistent with what it believed was a clear prohibition, the carrier's action had been unjustified under the agreement, and, therefore, created a major dispute under the RLA. Thus, the union was likely to prevail on the merits and obtain a final injunction to maintain the status quo during completion of the "major dispute" procedures.[6]

Our reading of the agreement and the testimony about its negotiation leaves us somewhat less certain than the District Court that the carrier's assignment of the South American routes to the former Braniff attendants so clearly violates the agreement as to be a change of the agreement and hence a major dispute. Eastern has suggested several ways to read the agreement, and particularly section 2(A)(1), that either authorize the company to hire non-union flight attendants for overseas routes or at least leave undecided the issue of such authority. For instance, there was testimony presented to the District Court that, while negotiating the Eastern-Local 553 agreement, the union had proposed a scope clause that would have secured for Local 553 members the right to fly all Eastern flights, both domestic and international; Eastern argues that the scope clause finally agreed upon at most protected union members' seniority against flight attendants subsequently hired overseas but did not assure union members the right to bid for flying to be performed by flight attendants based abroad.[7] Another argument made by the airline is that the entire agreement, including the scope clause, should be read against the statutory background of the RLA, which Eastern contends is limited to the territorial United States. Under this reading, Eastern argues, section 2(A)(1) does not apply to flying performed by foreign national flight attendants based abroad.

■ Although we are undecided whether the dispute raised by this suit is, in fact, major or minor, we find no reversible error in the District Court's handling of this issue.[8] The line between major and minor

---

**6.** The terms "preliminary" and "final" can cause misunderstanding with respect to injunctions sought in RLA disputes to preserve the status quo pending an opportunity for mediation under the "major dispute" procedures of the Act. In a case such as this, the District Court's "final" injunction, if issued at the conclusion of the litigation, will not be permanent, but will last only for the time necessary to pursue the "major dispute" procedures. After that, the Act remits the parties to self-help. This temporary feature of the "final" injunction should not obscure the entirely different sense in which the "preliminary" injunction is limited in time. Like all preliminary injunctions, this one lasts only until the District Court has had an opportunity to adjudicate the merits of the dispute. In this case, those merits concern whether the union has shown the existence of a major dispute that warrants an injunction pending completion of the mediation processes of the Act. Cf. *Guinness-Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468, 472 (2d Cir.1980) (injunction pending arbitration).

**7.** The union originally requested the following scope clause:

It is agreed that any and all flying in and for the service of Eastern Airlines, Inc. will be performed by flight attendants whose names appear on the then current Eastern Airlines Flight Attendants system seniority list, and all such flying will be done under the then current contract.

Section 2(A)(1), as adopted, omits the final clause of the proposal, which explicitly required that the contract apply to all flying. In light of this omission, the company contends that the current scope clause requires at most that the Braniff flight attendants be put on the company seniority list. In fact, after the District Court issued its decision on August 16, the company offered to put the Braniff attendants on the seniority list, although the company did not do so once it became apparent that such action would not constitute compliance with the District Court's order.

**8.** The District Court did not assess the size of the disturbance caused by this dispute. Most analogous RLA disputes have arisen when the carrier has attempted to discharge a large number of employees, usually due to advances in automation. Large layoffs tend to give rise to major disputes, *see, e.g., Missouri-Kansas-Texas Railroad Co.,* supra, while small layoffs are apt to be minor, *see., e.g., Rutland Railway Corp.,* supra. In this case the number of employees seriously affected and the degree of

disputes is blurred, and, on the facts as developed at this stage of the litigation, we conclude that the District Court was not in error in deciding that Local 553 was likely to show that the dispute was major.

### B

■ Eastern also challenges the District Court's conclusion that Local 553 would suffer irreparable harm absent preliminary injunctive relief. As the District Court noted in its opinion, there is some question whether a showing of irreparable harm is even necessary before enjoining a carrier in a major dispute. However, because the District Court was ordering a preliminary rather than a final injunction, there is no doubt that a finding of irreparable harm was necessary. *See Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 758 (2d Cir.1979). While the question is close, we conclude that the District Court was entitled to find Local 553's showing of irreparable harm sufficient to support a preliminary injunction in this case.

Under the assumption that Eastern wrongfully hired the Braniff flight attendants, the members of Local 553 would suffer two distinct harms while the two sides were awaiting the District Court's decision on the merits. First, the membership would lose the amount of additional wages that would have been paid to many union members if senior members had been awarded the South American flights. Although the approximate quantity of this loss could be calculated,[9] the District Court concluded that "it will be exceedingly difficult, if not impossible, to determine the identity of the Union members injured by this violation and the degree of their injury." Without a proposal from either side for a system-wide "paper bid" procedure,

the Court lacked the means to determine which attendants would have had their next higher preference for routes honored if the senior attendants had been awarded the South American routes. The second harm caused the union was less tangible. In addition to lost wages, many union members would suffer intangible losses by flying less desirable routes with less satisfactory working conditions than they would have flown had the South American routes been available for Local 553 bidding.

We do not believe that the intangible detriment caused Local 553 members by not being able to fly South American or other preferred routes is sufficiently serious to be considered irreparable injury. *See Sampson v. Murray,* 415 U.S. 61, 88–92, 94 S.Ct. 937, 951–954, 39 L.Ed.2d 166 (1974); *Independent Union of Flight Attendants v. Pan American World Airways,* 502 F.Supp. 1013, 1020 (D.D.C.1980). Personal inconvenience is not the irreparable harm that warrants preliminary injunctive relief.

Normally, the tangible loss of increased wages would also not suffice to establish irreparable injury. But we think it was within the District Court's discretion to find irreparable injury here because of the difficulty, as perceived at the time of the Court's ruling, of determining the identity of all the attendants who would suffer lost wages. As the District Court correctly noted, the decision not to assign Local 553 members to the South American routes has ramifications for bidding by the entire membership. Some seniors could have increased their earnings by flying the South American routes; others could have earned more by flying the routes that the senior attendants surrendered. And perhaps most importantly, after all the working attendants could have upgraded their assign-

---

effect upon the rest of the membership should be weighed in determining the nature of the dispute.

**9.** The approximate size of the financial loss would be the amount that union members would have been paid for flying the South American routes multiplied by the number of senior attendants who would have flown those routes. These senior attendants would suffer a

portion of the total loss (the difference between wages on routes actually flown and wages on the South American routes); the rest of the loss would be distributed among the other attendants (the difference between wages on routes actually flown and wages on routes they would have flown if senior attendants had flown the South American routes).

ments, many junior members of the union could have returned to the workplace from voluntary leaves. Judge Sifton was not presented with any means of determining which individuals would lose wages and what amounts each would lose. We note in passing, however, that in the more typical labor disputes in which a company has eliminated a number of positions, there is no similar irreparable harm to justify a preliminary injunction because the financial injury will fall directly on an easily ascertainable group of employees—the most junior members. Irreparable harm exists in the instant case only because the alleged misconduct is the failure to add a group of highly desirable positions, which has a ripple effect throughout the entire union membership, causing financial consequences difficult to ascertain.

## IV

■ The Norris-LaGuardia Act presents another complexity to this case. Eastern claims that both section 7 and section 8 of the Act, 29 U.S.C. §§ 107, 108 (1976), prevent the District Court from granting injunctive relief in this case. As has been noted elsewhere, the Norris-LaGuardia Act, if read for all it is worth, would severely diminish a federal court's capacity to vindicate certain sections of the RLA. *See Southern Railway Co. v. Brotherhood of Locomotive Firemen & Enginemen,* 337 F.2d 127, 133 (D.C.Cir.1964); *American Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 169 F.Supp. 777, 785–89 (S.D.N.Y.1958). But, when the Norris-LaGuardia Act and the RLA both apply to a dispute, there must be "an accommodation of [the two Acts] so that the obvious purpose in the enactment

of each is preserved." *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., supra,* 353 U.S. at 40, 77 S.Ct. at 640.

Under section 7(c) of the Norris-LaGuardia Act, before granting temporary or permanent injunctive relief a court must find: "That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief." 29 U.S.C. § 107(c). Because the District Court concluded that imposing the section 7(c) requirement on injunctions sought to preserve the status quo during the mediation process prescribed for major disputes would undermine the RLA, the Court ruled that section 7(c) did not apply to this case and that Local 553 did not need to demonstrate that the balance of hardships tipped in the union's favor.

■ We agree with the District Court that section 7(c) should not apply to injunctions designed to preserve the status quo during major disputes.[10] In a major dispute, the status quo provisions are "central to [the RLA's] design." *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, supra,* 396 U.S. at 150, 90 S.Ct. at 299. The RLA sets up an elaborate procedure designed to induce both parties to a labor dispute to resolve their differences peacefully and voluntarily. *See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., supra,* 394 U.S. at 378, 89 S.Ct. at 1115. Only if both sides are required to maintain the status quo during the pendency of these procedures can the machinery provided in the Act promote the labor peace that its framers desired. *See* 45 U.S.C. § 151a (1976). It is for this reason

10. Arguably, accommodations in the application of the Norris-LaGuardia Act should only be made when a court rules finally on the merits that a major dispute is presented and seeks to enjoin the party in violation of the RLA. If so, then section 7(c) need not be displaced at this stage of the instant case, in which preliminary relief is sought in a dispute that the District Court may conclude is minor rather than major. Such an interpretation of the Norris-LaGuardia Act would mean that courts could not order preliminary relief in RLA cases simply on findings of irreparable harm and likelihood of success on the merits. They would also have to find that the balance of hardships favors the complainant. Without ruling on this question of law, we note that in this case, once the modified bidding procedure became available, the equities supporting its use tipped heavily in favor of the union. Even under the District Court's original preliminary injunction, the equities probably also favored Local 553.

that the courts have considered the status quo obligations imposed by the RLA to be "mandatory." *American Airlines, Inc. v. Air Line Pilots Ass'n, supra,* 169 F.Supp. at 787. Applying the equitable considerations of section 7(c) of the Norris-LaGuardia Act in this case would be inconsistent with the mandatory maintenance of the status quo during major disputes that the RLA requires. *Cf. Southern Railway v. Brotherhood of Locomotive Firemen & Enginemen, supra,* 337 F.2d at 133 (reading exception into section 4 of the Norris-LaGuardia Act).

Section 8 of the Norris-LaGuardia Act, however, does not conflict with the RLA. Section 8 states that injunctive relief should not extend to any complainant who "has failed to comply with any obligation imposed by law . . . or who has failed to make every reasonable effort to settle such dispute." 29 U.S.C. § 108. This provision is almost identical to section 2, First, of the RLA, which imposes on all parties the duty to make every reasonable effort to settle the dispute. 45 U.S.C. § 152, First. Since section 8 is congruent with the RLA, Local 553 should be held to section 8's requirements, as the District Court concluded.

Moreover, we agree with the District Court that Local 553 has complied with section 8. As soon as the union learned that Eastern might hire the Braniff flight attendants, Local 553 made its position clear and attempted to work out a compromise with the airline. They met repeatedly at the bargaining table, and waited to file a grievance until two weeks after the company assigned the non-union workers to the South American routes. Throughout the deliberations, the union representatives have participated in every statutorily mandated step and have contributed several creative proposals for resolving the problem. In light of these efforts, we agree with the District Court that Local 553 has complied with the requirements of section 8.

■■■ Thus, the Norris-LaGuardia Act does not bar the District Court's action because section 7(c) does not apply to this case and because the requirements of section 8 were met by the union.[11]

V

Although we conclude that the District Court was acting within its discretion when it granted Local 553's motion for preliminary injunctive relief, we also rule that the District Court's preliminary injunction, which we conditionally stayed, should not now be reinstated in its original form.

As described above, the irreparable harm in this case was the seemingly unascertainable incidence of financial injury caused to the membership of Local 553 by Eastern's decision to employ the former Braniff flight attendants. To prevent this injury the District Court offered Eastern two alternatives. The first was simply to assign the Braniff routes to Local 553 members, thereby permitting senior attendants and many others to gain the improved pay resulting from the addition of new and preferred routes. However, out of consideration for Eastern's fear that it might lose the South American routes if local attendants were not assigned to these routes, the Court also permitted Eastern the option of (a) grounding all Local 553 members who wished to make a paper bid on the South American routes and whose seniority would have entitled them to win these routes and (b) holding their pay for such routes until determination of whether they were entitled to fly them. That option, which Eastern accepted, opened up the routes vacated by the successful paper bidders and permitted the rest of the membership to move up to more preferred routes. The second option eliminated the ripple effect, but created the dis-

11. The union also argues that section 7(b) of the Norris-LaGuardia Act, 29 U.S.C. § 107(b) (1976), which requires that a complainant show substantial and irreparable harm before a labor injunction issues, should not apply to status quo injunctions arising out of major disputes under the RLA. We express no opinion on this point. Because the District Court was ordering a preliminary injunction in this case, it had to find irreparable harm before that injunction could issue. *See Jack Kahn Music, supra,* 604 F.2d at 758. Apart from the Norris-LaGuardia Act, there is an independent irreparable harm requirement for preliminary injunctions.

tinct possibility that some members would draw pay for staying at home, hardly a result compatible with a court's equitable powers unless truly unavoidable.

After the District Court imposed its preliminary injunction, we elicited from the parties at oral argument a better method of alleviating the union's irreparable harm: a modified bidding procedure that records all the assignments that would have taken place if the South American routes were open to Local 553 members, but assigns Local 553 members as if the South American routes were not available. Under this plan, no member is paid to stay home, and a record is maintained that shows the increased pay each member would have received if senior members had been awarded the South American routes. On September 23, we stayed the District Court's preliminary injunction on the condition that Eastern conduct the modified bidding and maintain records necessary to compensate the appropriate union members if the union prevails.[12] Since we find this solution a more appropriate use of the federal judiciary's equitable powers than the District Court's original preliminary injunction, we order that the preliminary injunction be reinstated in a modified form that requires Eastern to continue the bidding procedure, outlined in our September 23 order, until the District Court has ruled on the merits of this case.

One final matter requires our attention. Affidavits that Eastern supplied this Court suggest that many flight attendants who bid for and "won" the South American routes under the District Court's preliminary injunction had previously asked to take leave in the fall of 1982 and may have signed up for the South American routes on the off chance that they might be paid for their leaves. It would be intolerable for

parties to exploit equitable relief in this fashion, and such exploitation, if proven to be true, might justify vacating the original preliminary injunction entirely. However, we appreciate that vacating the injunction would penalize many other flight attendants who wanted to fly the South American routes, bid for them without guile, and stayed home in reliance on the terms of the injunction.

In light of the unusual circumstances of this case, we have decided upon the following resolution. In addition to the prospective modification of the injunction, we will make a partial retroactive modification. The injunction, as originally issued, will be vacated from the date of issuance to the effective date of our stay, October 1, as to those attendants who bid on the South American routes only to have the chance of getting paid for leave time. Upon remand the District Court will identify those attendants through use of objective criteria to the extent possible. An attendant who made a request for leave within a date reasonably close to the original paper bid procedure ordered by the District Court and thereafter bid on a South American route would be presumed to have bid for the purpose of getting paid for leave time, subject to the attendant's satisfying the District Court by evidence that he or she in fact wanted to fly the South American route for which the bid was made. With a view to avoiding a series of lengthy individual hearings we encourage the parties to resolve any disputes in this limited phase of the litigation if at all possible.

The preliminary injunction, as modified in accordance with this opinion, is affirmed, and the cause remanded for further proceedings. No costs.

12. By "prevail" we mean that the union ultimately secures a final ruling that the dispute is major and a final injunction to maintain the status quo pending RLA mediation procedures. If the dispute is determined to be minor, it is still possible that a limited form of injunction would be appropriate, in the event the District Court determines that some relief is necessary to preserve the jurisdiction of the Adjustment

Board to order whatever relief the Board deems appropriate. In that event, continuation of the modified bidding procedure pending decision by the Adjustment Board is one option the District Court may wish to consider; however, if such relief is ordered incident to a minor dispute, it will be entirely up to the Adjustment Board to determine whether any wage increments are to be paid to Local 553 members.