INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, and District Lodge 100, International Association of Machinists and Aerospace Workers, AFL–CIO, Plaintiffs,

v.

BRITISH AIRWAYS PLC, Defendant.

No. 88 C 3438.

United States District Court, E.D. New York.

Feb. 2, 1989.

Vladeck, Waldham, Elias & Engelhard, P.C. (Patricia McConnell, of counsel), New York City, for plaintiffs.

Epstein Becker & Green, P.C. (Harry N. Turk, of counsel), New York City, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs, labor unions representing certain of defendant's employees, brought this action under the Railway Labor Act of 1926, as amended (the Act), 45 U.S.C. § 151 *et seq.* (1982). The complaint alleges that defendant, an international air carrier, is violating the *status quo* in effect under the Act by hiring subcontractors to do reconstruction work at its John F. Kennedy International Airport (JFK) terminal. Plaintiffs move for a preliminary injunction.

### I.

The court held a hearing on the motion at which both parties called witnesses. The facts are gleaned from their testimony and supporting affidavits.

On January 10, 1985, plaintiffs and defendant executed a collective bargaining agreement (the Agreement) setting forth the rates of pay, rules, and working conditions of certain British Airways employees, including those in "maintenance and related job classifications" (maintenance workers), of whom there are about 40. The Agreement was to expire on May 31, 1987 and renew itself automatically unless either party served on the other "written notice of intended change" under section 6 of the Act, 45 U.S.C. § 156, at least ninety days prior to the expiration date.

On February 25, 1987, defendant served plaintiffs with written notice of intended changes in the Agreement. Plaintiffs later notified defendant of changes that they intended. The parties began negotiations over the proposed changes.

Among the changes sought by defendant. is a modification of the "scope" clause, Article II(b) of the Agreement. The clause now provides in relevant part:

> All work performed by [defendant], including the work of all classes and grades of Storekeepers, Port Stewards, Baggage Agents and mechanical employees ... is recognized as coming within the jurisdiction of [plaintiffs]....

> The Company agrees that the making, assembling, erecting, dismantling and repairing of all machinery, mechanical equipment, engines and motors of all description, including ... all maintenance, construction and inspection work in and around all shops, hangars and buildings ... is recognized as coming within the jurisdiction of [plaintiffs].... It is understood the Company reserves the right to continue contracting out work historically contracted out....

Defendant wants to add to this clause the following provision:

> [T]he Company may contract out further work falling within the scope of this Agreement where there is an economic benefit to do so.

Plaintiffs believe that acceptance of this change would result in the elimination of many maintenance workers' jobs.

In January 1988 the parties reached an impasse in their negotiations and requested the help of the National Mediation Board (the Board). They continue to negotiate changes in the Agreement with the mediation of the Board.

Meanwhile, in December 1987 defendant entered into a "worldwide marketing and customer service partnership" with United Airlines (United). As part of this partnership, United and defendant are to share terminal space at a number of major airports, including JFK.

Defendant anticipated that the lessor of its terminal building at JFK, the Port Authority of New York and New Jersey (the Port Authority), would compel it to make significant improvements in its terminal space when its lease expired in 1994 or face loss of the lease. United had already lost its long-term lease and had been forced to share its space with another carrier. Defendant and United therefore agreed to share defendant's terminal building and to spend approximately $80 million on expansion and improvement of the existing facility.

Defendant negotiated a new long-term lease with the Port Authority to expire in the year 2015. United obtained a concurrent sublease on one-half of the space. Under the terms of the lease, defendant must spend at least $60 million to upgrade the terminal. The work must be completed by July 1, 1991.

The reconstruction plans call for the size of the terminal to be increased by 25 percent, or 75,000 square feet. The number of aircraft parking positions, or "gates," will be increased from nine to twelve, and some of the old gates will have to be relocated. Each new or relocated gate will require a new fixed ramp services area, or "pit," containing an underground heating, cooling, and electrical unit used to service the airplanes between flights. Approximately 65 percent of the total ramp space, or 460,000 square feet of ramp area, will have to be replaced. Defendant has not undertaken a comparable reconstruction project since it acquired its JFK terminal.

Reconstruction work began in August 1988. Much of the work completed to date has involved relocation of the Concorde lounge inside the terminal and repaving some of the tarmac. Plaintiffs have not claimed that their members are entitled to perform this work.

They do, however, contend that under the Agreement defendant must allow the maintenance workers to remove the old heating, cooling, and electrical units in the pits, install new equipment, and modify the tarmac around the pits. Defendant has subcontracted this work, claiming that the maintenance workers do not have the skills or licenses necessary to complete the project.

The particular maintenance workers who ought under plaintiffs' theory to be installing the new pits are the fixed ramp services workers (FRS workers), of whom there are at present only two. The FRS workers are primarily responsible for maintenance and repair of the heating, cooling, and electrical units serving the pits. FRS and other maintenance workers also construct light equipment, such as "aircraft marshaling stands" (which resemble ladders), "snubbers" (hydraulic devices that hold aircraft doors open and close them gently), "oil bowsers" (a kind of portable fuel pump), and a "tire cage." FRS workers installed a heating unit on one occasion. Plaintiffs claim that the maintenance workers have expertise in welding, electrical work, laying pipe, cement work, masonry, and painting, but only those who work on the aircraft have professional licenses.

The parties agree that if defendant were to complete the reconstruction on schedule using plaintiffs' members it would have to hire many more FRS workers.

Although defendant has never undertaken comparable reconstruction of the pits and tarmac at its JFK terminal, in 1983–87 outside contractors performed major renovations of the terminal building. Outside contractors have also done concrete maintenance and repair, renovation of the ramp areas, refurbishing of the underground air conditioning units, and electrical work.

On September 1, 1988, plaintiffs notified defendant that it "might" consider the subcontracting a violation of both the Agreement and the *status quo* requirement of the Act. After an unproductive meeting with defendant's management on September 27, 1988 to discuss the dispute, plaintiffs filed this action.

## II.

The Act establishes a comprehensive scheme for resolving labor disputes in the airline industry. *See* 45 U.S.C. §§ 181, 183. The purpose of the Act is to prevent wasteful strikes and interruptions in interstate commerce. *Detroit & T.S.L. R.R. v. United Transp. Union*, 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969) (*Shore Line*); *see* 45 U.S.C. § 151a.

■ When one party to a collective bargaining agreement notifies the other under section 6 of the Act, 45 U.S.C. § 156, of proposed changes in the agreement affecting rates of pay, rules, or working conditions, as was done in this case, both parties must "preserve and maintain unchanged those actual, objective working conditions and practices ... which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Id.* at 153, 90 S.Ct. at 301. If either party violates the *status quo*, the other party may seek to enjoin the violation in federal district court. *Local 553, Transport Workers v. Eastern Air Lines*, 695 F.2d 668, 674 (2d Cir.1982). In most instances, however, the court may only enjoin the challenged action if it constitutes a "major dispute." *Id.* at 674–75.

■ "Major disputes" relate to "the formation of collective agreements or efforts to secure them," whereas "minor disputes" relate to "the meaning or proper application of a particular provision" in an existing agreement. *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945). Major disputes "look to the acquisition of rights for the future, not to assertion of rights that have vested in the past." *Id.* If a carrier takes an action of questionable validity under the existing agreement, dispute over

that action may be termed "major" if the carrier's contractual justification for its action is "obviously insubstantial." *Local 553, Transport Workers, supra,* 695 F.2d at 673, and cases cited. Other factors may also be considered, such as the magnitude of the action's effect on working conditions and the likelihood that a strike will result. *Id.* at 674.

If a carrier proposes to take action that changes an agreement, precipitating a major dispute, it must give the union notice under section 6 and engage in a prolonged mediation process, *see* 45 U.S.C. §§ 152, Seventh, 183, rather than the binding adjudication by an Adjustments Board used for minor disputes, *see* 45 U.S.C. §§ 153, First, 184; *Local 553, Transport Workers, supra,* 695 F.2d at 674. During mediation, it must maintain the *status quo* just as after any section 6 notice. If either party violates the *status quo,* the other party may seek injunctive relief from the appropriate district court. If, however, the dispute is minor, an injunction is available only if necessary to enable the party that ultimately prevails before the Adjustment Board to obtain "a significant remedy." *Id.*

Plaintiffs contend that defendant's action in subcontracting the work on the pits violates the *status quo.* They further argue that the resulting dispute is "major," entitling them to injunctive relief. Defendant urges that the reconstruction subcontract does not violate the *status quo* and that the dispute is not in any event "major."

### III.

■ This case is unusual in that the dispute before the court—the subcontracting of the reconstruction project—is not the dispute that triggered the *status quo* requirement. Under the Act, that requirement went into effect when defendant served plaintiffs with its section 6 notice of intended changes. Defendant must thus maintain the *status quo* existing as of February 27, 1987, whether the subcontracting is a "major" dispute or not.

The questions before the court are: (1) whether defendant violated the *status quo* by subcontracting the work on the pits; and (2) if so, whether the court may enjoin defendant's action. An injunction is appropriate only if the subcontracting constitutes a "major" dispute or if it threatens to undermine the Adjustment Board's jurisdiction. *Id.* at 674–75.

The first question requires the court to determine how a major reconstruction project, the first of its kind undertaken by defendant, affects the "actual, objective working conditions and practices, broadly conceived," *Shore Line, supra,* 396 U.S. at 153, 90 S.Ct. at 301, existing at that time.

In plaintiffs' view, the fact that this project has no historical precedent favors their position because the work cannot fall under the "historical contracting" exception to the "scope" clause. They contend that the work belongs to them under the Agreement and thus constitutes an "actual, objective working condition."

Defendant maintains that the reconstruction project cannot be part of the *status quo* because it is not work that the FRS workers have ever done. They point out that major construction projects have historically been contracted out.

Section 6 prohibits alteration of the "rates of pay, rules or working conditions" prevailing when notice was given, whether or not they are specified in the Agreement. *Id.* at 153–55, 90 S.Ct. at 301–302. The section envisions a "freeze" on the "actual, objective" conditions experienced by bargaining unit members from day to day. Defendant may not, for example, assign workers to different jobs from those they customarily perform or force them to work under different conditions.

Section 6 cannot, however, "freeze" interpretation of the Agreement where a particular application of it has never come up before. In such a case, whether the court agrees with plaintiffs' interpretation or defendant's, the result will be by definition a departure from the *status quo* because the situation had never occurred at the time the "freeze" went into effect.

The bare fact that the FRS workers cannot complete the work on schedule unless their numbers are substantially increased

supports the view that the reconstruction of the pits is not relevant to the *status quo*. The carrier's action does not affect the working conditions or threaten the job security of the two present FRS workers; it merely prevents new people from being added to the bargaining unit.

"[D]eprivation of a work opportunity involving the type of work traditionally performed by the Union is a change in working conditions." *Local 553, Transport Workers v. Eastern Air Lines*, 544 F.Supp. 1315, 1327 (E.D.N.Y.), *modified*, 695 F.2d 668 (2d Cir.1982). But here plaintiffs complain of deprivation of a work opportunity that in no way resembles the repair, maintenance, and light equipment construction historically performed by the maintenance workers.

The *Shore Line* case emphasizes that the purpose of the *status quo* requirement is the prevention of strikes. *Id.* 396 U.S. at 150, 90 S.Ct. at 299. It is thus appropriate for the court to consider, as in determining whether a dispute is "major," *see Local 553, Transport Workers, supra*, 695 F.2d at 674, whether the carrier's action is likely to provoke a strike.

In this case, the underlying conflict between the parties—the proposed change in the "scope" clause of the Agreement now the subject of mediated negotiation—is a matter of great moment to plaintiffs and might well be of the sort to provoke a strike. The subcontracting of the reconstruction work is not, however, of this nature. It affects not the FRS workers now on the job but others who would be hired if plaintiffs were assigned the work. It is not likely that plaintiffs will strike on behalf of persons not now members of the bargaining unit.

The court therefore holds that defendant has not violated the *status quo*.

## IV.

■ Since defendant's action does not violate the *status quo*, there is nothing for the court to enjoin. It is therefore unnecessary for the purposes of this motion to consider whether the dispute is "major." If the dispute is "minor," however, the court will have no jurisdiction to grant the relief requested by plaintiff unless an injunction is necessary to "preserve [the dispute] for the Adjustments Board." *Local 553, Transport Workers, supra*, 695 F.2d at 675; *see Baylis v. Marriott Corp.*, 843 F.2d 658, 663 (2d Cir.1988); *Independent Union of Flight Attendants v. Pan Am. World Airways*, 789 F.2d 139, 141 (2d Cir. 1986) (citing *Andrews v. Louisville & N.R.R. Co.*, 406 U.S. 320, 322, 92 S.Ct. 1562, 1564, 32 L.Ed.2d 95 (1972)). The court will therefore decide whether the dispute is "major" on its own motion to determine whether it has any further jurisdiction over this controversy.

As the *Elgin* case explains, major disputes concern the formation or alteration of collective bargaining agreements, while minor disputes concern the interpretation of an existing agreement. In cases involving renegotiation of an agreement, however, the carrier will inevitably claim that a proposed action relates to "interpretation" rather than "alteration" of the agreement. Later courts have therefore refined the test "to determine whether a plausible interpretation would justify the carrier's action." *Local 553, Transport Workers, supra*, 695 F.2d at 673.

"A dispute is major if the carrier's contractual justification for its actions is 'obviously insubstantial.'" *Id.* (citing *United Trans. Union v. Penn Central Transp. Co.*, 505 F.2d 542, 544 & n. 5 (3d Cir.1974); *Airlines Stewards & Stewardesses Assoc., Local 550 v. Caribbean Atl. Airlines*, 412 F.2d 289, 291 (1st Cir.1969)). It is minor "if the contract is 'reasonably susceptible' to the carrier's interpretation." *Id.* (citing *Southern Pac. Transp. Co. v. United Transp. Union*, 491 F.2d 830, 833 (9th Cir.), *cert. denied*, 416 U.S. 985, 94 S.Ct. 2389, 40 L.Ed.2d 762 (1974); *United Transp. Union v. Burlington N.*, 458 F.2d 354, 357 (8th Cir.1972)). As noted earlier, the extent of the disruption caused by the dispute may also be a factor. *Id.* at 674 and cases cited.

In this case, plaintiffs assert rights that they contend have vested in the past under the Agreement. *See Baylis, supra*, 843

F.2d at 663 (citing *Elgin, supra,* 325 U.S. at 723, 65 S.Ct. at 1289). Moreover, the contract is "reasonably susceptible" to the carrier's interpretation. Although Article II(b) of the Agreement begins: "All work performed by [defendant] ... is recognized as coming within the jurisdiction of [plaintiffs]," it is evident from the detailed description of the relevant work given in that paragraph and the succeeding one that the Agreement does not cover "all work" of any description but only the kind of work described in those two paragraphs and performed by the classes of workers covered by the Agreement.

The language in the second paragraph indicating that the relevant work includes "all maintenance, construction and inspection work in and around shops, hangars and buildings" may arguably support plaintiffs' claim to the work in the pits, since that work involves "construction" "around" the hangars and buildings. But defendant's contention that Article II(b) covers only routine maintenance and repair work and construction of light equipment of the sort the maintenance workers have done in the past is at least equally plausible.

Plaintiffs argue that the dispute is nonetheless "major" because it relates to defendant's proposed change of Article II(b) in the Agreement. Under the contracting clause proposed by defendant, subcontracting the reconstruction work would clearly be permissible. Plaintiffs contend that defendant is engaging in impermissible self-help because it is exercising a right that it has not yet won at the bargaining table.

As noted above, however, it is far from clear that defendant's actions are unjustified under the Agreement. The fact that defendant's proposed addition to the collective bargaining agreement would remove the question from all doubt is not sufficient to elevate the controversy over the subcontracting to the status of a "major" dispute. The dispute is therefore "minor."

Plaintiffs have not alleged that defendant's action "threaten[s] to undermine the Adjustment Board's jurisdiction" or "prevent the Adjustment Board from giving a significant remedy to the side that prevails before the Board." *Local 553, Transport Workers, supra,* 695 F.2d at 675. Nor does it appear that any such threat could foreseeably result from this dispute. The court therefore has no jurisdiction to grant any relief requested by plaintiff.

The motion for preliminary injunction is denied. The complaint is dismissed.

So ordered.