**SAFEWAY TRAILS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**United Transportation Union, Intervenor.**

**No. 78–1155.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 16, 1979.

Decided Sept. 18, 1979.

Certiorari Denied Feb. 19, 1980.

See 100 S.Ct. 1016.

---

55. *Id.* at 12.

John H. Leddy, Philadelphia, Pa., for petitioner.

Jay E. Shanklin, Atty., N. L. R. B., Washington, D. C., with whom John S. Irving, Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., were on brief, for respondent.

Edward D. Friedman, Washington, D. C., with whom Jacob I. Karro, Washington, D. C., was on brief, for intervenor.

Before LEVENTHAL and ROBINSON, Circuit Judges, and VAN DUSEN,* Senior Circuit Judge, United States Court of Appeals for the Third Circuit.

Opinion for the court per curiam.

PER CURIAM:

Safeway Trails, Inc. ("the Company") has petitioned this court for review of an order of the National Labor Relations Board ("NLRB" or "Board").[1] The Board found that the Company had violated Section 8(a)(5) of the National Labor Relations Act[2] by failing to bargain in good faith. Specifically, the Board found that the Company had attempted to "undermine and subvert" the authority of the employees' chief bargaining representative, John Lantz.[3] We affirm.

## BACKGROUND

The Company is the operator of an interstate motor coach system. For more than thirty-five years, the United Transportation Union (UTU) has represented the Company's motor coach operators. The most recent contract ran from April 1, 1969 to March 31, 1972. In February of 1972, UTU and the Company began negotiating a new contract, but reached no agreement before the old contract expired. On April 2, 1972, the motor coach operators went out on strike. On January 13, 1973, with the operators still on strike, the Company resumed operations after informing its striking employees of its intent to do so. The strike ended on March 12, 1975, when UTU notified the Company that it was terminating the strike and making an unconditional offer to return to work. During this entire period, the union's chief negotiator was its general chairman, John Lantz.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. *Safeway Trails, Inc.,* 233 NLRB No. 171, 96 LRRM 1614 (1977).

2. 29 U.S.C. § 158(a)(5) (1976).

3. 96 LRRM at 1618.

In April of 1973, UTU filed a complaint alleging violations of Section 8(a)(5). Following extensive hearings, an administrative law judge (ALJ) recommended that the complaint be dismissed. Although he recognized that the Company had engaged in actions that tended to undermine the authority of the union's bargaining representative, the ALJ stated that the Board's General Counsel had conceded that bargaining was conducted in good faith. Such a concession would, of course, preclude a finding of an 8(a)(5) violation. The Board affirmed the ALJ's findings and accepted his recommendation that the complaint be dismissed.

UTU petitioned this court for review of the Board's dismissal of the complaint. A panel of this court determined that there was no evidence to support the finding that the General Counsel had conceded good faith bargaining on the part of the Company.[4] Additionally, the court determined that the Board's failure to consider the Company's away-from-bargaining-table actions as evidence of bad faith constituted a departure from previous Board policy,[5] and remanded the case to the Board.[6]

On remand, the Board reviewed the evidence and determined that the Company had attempted to undermine Lantz's authority.[7] The Board also stated that even though a party engaged in the at-the-table formalities of collective bargaining, bad faith sufficient to constitute an 8(a)(5) violation could be established on the basis of the away-from-the-table behavior.[8] We

have reviewed this opinion and conclude that it is supported by substantial evidence and should be affirmed.

## DISCUSSION

[1] In *General Electric Company*,[9] the Board held that it violated the obligation to bargain in good faith

> for an employer to mount a campaign . . . for the purpose of disparaging and discrediting the statutory representative in the eyes of its employee constituents, to seek to persuade the employees to exert pressure on the representative to submit to the will of the employer, and to create the impression that the employer rather than the union is the true protector of the employees' interests.

The evidence in this case clearly establishes that the Company engaged in this prohibited conduct.

For example, at a bargaining session on August 22, 1972, the Company presented a contract proposal to the Union, requesting that it be presented to the employees. Determining that the offer was not very different from a previous offer rejected by the membership, the union decided not to present it to the employees and so informed the Company on August 23. Even though another bargaining session was scheduled for August 28, on August 24, the Company sent copies of the contract to the employees. Attached to the contract was a letter blaming Lantz for the failure to reach an agreement. The letter told the employees that

4. *United Transportation Union Local 1699 v. NLRB,* 178 U.S.App.D.C. 272, 274, 546 F.2d 1038, 1040 (1976).

5. *Id.* at 275, 546 F.2d at 1041. In particular, the court was concerned with the Board's decision in *General Electric Co.,* 150 NLRB 192 (1964), *enforced,* 418 F.2d 736 (2d Cir. 1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970). According to the court, *General Electric* held that if an employer's away-from-the-bargaining-table activities are directed toward undermining the bargaining representative of the employees, bad faith and a Section 8(a)(5) violation are established even though overt evidence of that bad faith does not appear at the bargaining table itself. The court felt that by confirming the ALJ's decision that some at-the-table evidence of bad faith must be

introduced to make out an 8(a)(5) violation, the Board had "impermissibly 'backed into' a change of the law." *See Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

6. 178 U.S.App.D.C. at 275, 546 F.2d at 1041.

7. 96 LRRM at 1618.

8. *Id.* at 1615.

9. 150 NLRB 192, 194–95 (1964), *enforced,* 418 F.2d 736, 756–57 (2d Cir. 1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970).

"the time for action . . . is past due" and that each employee should "act in the interest of [his] own personal welfare and aid in getting an early settlement." [10]

On December 7, 1972, the Company sent Lantz a letter and a "complete contract document," stating that it was the Company's "final offer." Copies of the letter and the contract were sent to all the employees. One week later, the Company sent a follow-up letter to twenty-six senior striking employees. The letter noted that it was "very puzzling" why "operators, who have been with this Company so many years, would allow a chairman with a 1967 seniority date to take over and control the operators as he [Lantz] has done." It also suggested that the operators give the contract offer "serious consideration and then let Lantz know how you feel as a body of men." [11]

On February 28, 1973, after the Company had resumed operations, but while the strike still continued, the Company's president spoke with the wife of a striking employee. The president said "I can tell you how it [the strike] can be settled. I will meet with any three men on the roster other than John [Lantz], and I will guarantee that I can have this contract settled within two to three hours." [12]

In March, 1973, in a conversation with one of the more senior operators, the Company's president stated that he "couldn't understand why they couldn't do something to get this thing settled, that the older men get together and do something to get this thing settled." [13] During that same month, the Company's vice president told striking employees that they were "following the wrong man" (i. e., Lantz). [14]

Faced with this evidence, the Company argues that its communications with its employees cannot be used to establish overall bad faith because the Company was charged only with committing independent per se violations of Section 8(a)(5). This argument was disposed of by this court's earlier opinion in this case, which characterized the complaint as alleging "an overall bad faith charge." [15] Indeed, such a finding was a necessary predicate for that panel's remand order.

The Company also argues that since its statements to the employees did not contain a "threat of reprisal or force or promise of benefit," it violates Section 8(c) of the Act [16] to use the statements as evidence of an 8(a)(5) violation. The purpose of Section 8(c) "was hardly to eliminate all communications from the Board's purview, for to do so would be to emasculate a statute whose structure depends heavily on evaluation of motive and intent." [17] The section resulted from the Board's practice of inferring the existence of an unfair labor practice from a totally unrelated speech or opinion delivered by an employer. [18] Its purpose "was to impose a rule of relevancy on the Board in evaluating the legality of statements by parties to a labor dispute." [19]

In the case before us, the employer's communications are more than evidence of an unfair labor practice; they are the unfair labor practice itself. It defies logic and good sense to suggest that such statements are beyond the purview of the Board.

---

10. 96 LRRM at 1617.

11. *Id.*

12. *Id.* at 1617–18.

13. *Id.* at 1618.

14. *Id.*

15. 178 U.S.App.D.C. at 274, 546 F.2d at 1040.

16. 29 U.S.C. § 158(c) (1976) provides:
    (c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

17. *NLRB v. General Electric Co.,* 418 F.2d 736, 761 (2d Cir. 1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970).

18. *Id.* at 760. *See also* I Legislative History of the LMRA 1947, at 1541.

19. 418 F.2d at 760.

934

## THE BOARD'S REMEDY

The Board ordered that the Company pay the striking employees backpay from March 17, 1975, five days after their unconditional offer to return to work. Citing *Fibreboard Paper Products Corporation*,[20] the Company argues that the backpay award should be tolled to the date of the Board's decision finding an 8(a)(5) violation.

The instant case is clearly distinguishable from *Fibreboard.* Between the Board's two decisions in *Fibreboard,* the NLRB established a new policy regarding the duty to bargain over subcontract work. By contrast, there was no new policy in this case. Indeed, this court's remand order was premised on the Board's departure from the existing policy of *General Electric.*

There is a need for tolling backpay awards where there are "special factors" which make such awards unfair.[21] But one cannot toll from the date of a decision of the Board merely because it is on the books until it is reconsidered by the Board and modified. No opinion is "the law of the case" if it is duly reconsidered or appealed and changed. This is not a case where the employer has taken action in reliance on any pending decision. Someone must bear the burdens resulting from the employer's illegal actions. The Board was within its sound discretion in providing that the burden of the loss should fall on the employer rather than on the employees.

*Affirmed.*

---

**20.** 138 NLRB 550 (1962).

**21.** *NLRB v. R. J. Smith Construction Co.,* 178 U.S.App.D.C. 109, 114, 545 F.2d 187, 192 (1976).