**INDEPENDENT UNION OF FLIGHT ATTENDANTS, Plaintiff,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., Defendant.**

**No. 85 Civ. 7702 (RWS).**

United States District Court, S.D. New York.

Oct. 18, 1985.

---

**5.** Plaintiff does not even allege that a settlement *within* the policy limits was available.

**6.** *See Gordon*, 334 N.Y.S.2d at 608.

Leaf Sternklar & Drogin, New York City, for plaintiff; Ira Drogin, New York City, of counsel.

Morgan, Lewis & Bockius, Ernest F. Garb, New York City, for defendant; Harry A. Rissetto, Thomas E. Reinert, Jr., Robert D. Manfred, New York City, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Independent Union of Flight Attendants ("IUFA") filed its complaint on October 1, 1985, charging the defendant Pan American World Airways, Inc. ("Pan Am") with violating the Railway Labor Act, 45 U.S.C. § 151, *et seq.*, by coercing and disciplining flight attendants to work in excess of their contractually-set maximum duty hours; by offering economic incentives to flight attendants who agree to waive maximum hour limitations and guaranteed rest periods, and by disciplining an IUFA bargaining representative who attempted to aid the flight attendants in this controversy, thereby chilling the representational rights guaranteed under the Railway Labor Act.

By order to show cause, IUFA moved this court for a preliminary injunction enjoining Pan Am's practice of offering such waiver incentives and enjoining the discipline of flight attendants who exercise the maximum duty hour rights in dispute. The motion was heard in Part I, the assigned judge, the Honorable Leonard B. Sand being engaged in a criminal trial. Upon the facts found below and the conclusions set forth, IUFA's motion for a preliminary injunction is granted in part and denied in part.

### The Parties

IUFA is a labor union with its principal place of business in New York. IUFA has been duly certified and designated by the National Mediation Board, pursuant to the Railway Labor Act, as the collective bargaining representative of the flight service personnel of Pan Am for the purpose of collective bargaining representation under the Railway Labor Act.

Pan Am is a carrier by air as defined by the Federal Aviation Act of 1958, 49 U.S.C. §§ 1301–1542, and holds Certificates of Public Convenience and Necessity pursuant to that Act, and is subject to the provisions of the Railway Labor Act. Pan Am is a corporation duly organized and existing under the laws of the State of New York and maintains its principal place of business in New York.

### The Facts

The bargaining relationship between IUFA and Pan Am has existed since IUFA was certified as the flight attendant bargaining representative in 1977. The parties' second collective bargaining agreement became effective March 31, 1982 ("1982 Agreement") and expired under its terms as amended on December 31, 1984. Pursuant to the directives of the Railway Labor Act, 45 U.S.C. § 156, the parties issued "Notices of Intended Changes" and negotiated between themselves and later under the auspices of the National Mediation Board, and reached an agreement formally executed by the parties on April 11 and April 12, 1985 ("1985 Agreement"). The three part claim in this dispute centers around two provisions of the 1985 collective bargaining agreement whose scope and meaning are hotly contested. It is generally conceded that the 1985 Agreement provided a number of "give-backs" to Pan Am from the Union in exchange for certain other provisions.

Section 6 of the 1985 Agreement deals with "Conditions of Work and Rest," and part E of that section covers "Duty Day

Limitations," or the maximum number of consecutive hours that flight attendants may be required to remain on duty in connection with their flights. Section 6.E.2.d. contains the notification procedures required when the flight attendants wish to exercise the right to decline to depart or continue on a flight whose projected or actual duration has exceeded the duty day limitation formula set out in sections 6 E.2.a.[1] and 6.E.2.b.[2] Section 6.E.2.d. of the 1985 Agreement reads as follows:

d. Notification

In the event a Flight Attendant has reported for a duty period and the Company notifies the Flight Attendant of a delay in the planned departure of the flight or flight segment(s), the Flight Attendant shall, in consideration of the Duty Day Limitations of paragraph E.2.a. and b., indicate to the Company the deadline after s/he does not intend to effect a departure of the delayed flight or segment. Based upon such advice, the Company may release such Flight Attendant at any time after receiving such advice. *In no event shall a Flight Attendant be required to remain on duty in excess of h/h application duty day limitations.*

The second provision at issue in this dispute is the downline rest provision contained in section 6.G.1. of the 1985 Agreement[3] which provides for a minimum crew rest period of nine and one-half hours at regularly scheduled downline (*i.e.,* at a point other than the departure point for the flight) stops where flight crews are sent to hotels before their next scheduled depar-

ture. The relevant section of this provision is set out below:

G. **DOWNLINE REST**

1. Minimum crew rest at a layover station shall be normal travel time to the layover hotel facility beginning at release from duty, minimum off-duty time (see chart below) at the hotel facility, and normal travel time to the reporting point to arrive at the required report time. *Minimum actual off-duty time at the hotel shall begin when the Flight Attendant arrives at the hotel or when the hotel, having properly prepared a room, has a room key available, whichever is later.*

| Scheduled Duty Time | Off-duty Time at the Hotel | |
|---|---|---|
| | Scheduled | Actual |
| 00:00–11:59 hours | 9½ hours | 9½ hours |
| 12:00–13:59 hours | 18 hours | 12 hours |
| 14:00 hours and over | 24 hours | 18 hours (RTV) |

*Minimum actual off duty time at the hotel facility in HKG after a Flight Attendant has completed a SFO/HKG sector shall be no less than thirty (30) hours.*

*Minimum actual off duty time at the hotel facility in NRT after a Flight Attendant has completed a JFK/NRT sector shall be no less than thirty (30) hours.*

*In the pattern NYC/RIO/NYC which involves back-to-back long haul operations, the minimum scheduled lay-*

---

1. Section 6.E.2.a. of the 1985 Agreement reads as follows:

   *Except as provided in paragraph 2.b. below, a Flight Attendant who reports for duty shall not be required to remain on duty in excess of fifteen (15) consecutive hours or scheduled duty day plus two (2) hours whichever is greater.*

2. Section 6.E.2.b. of the 1985 Agreement reads as follows:

   A Flight Attendant who reports for a nonstop flight which is scheduled in excess of thirteen (13) hours shall not be required to exceed h/h

scheduled applicable duty day by more than three hours.

3. Note that sections 6.G.1. and 6.E.2.d. as printed above are contained in the 1982 Collective Bargaining Agreement between IUFA and Pan Am. The first page of the 1985 Agreement provides that the 1982 Agreement remains in full force and effect if not specifically modified by the Memorandum of Agreement entered into by the parties in 1985. The above part of 6.G.1. remained unaltered after the 1985 Agreement was negotiated.

*over time at RIO will be twenty-two (22) hours.*

## The Duty Day Limitation Controversy

The dispute concerning section 6.E.2.d. of the 1985 Agreement involves the scope of the flight attendants' right to refuse to begin or refuse to continue ("walk off") flight service on an aircraft when delays or diversions cause the projected or elapsed flight time to exceed an individual flight attendant's duty day hour limitations as set out in section 6.E.2 of the 1985 Agreement. According to IUFA, the provisions in section 6, particularly section 6.E.2.d., give flight attendants the right to compute their duty day limits in cases of downline delays or unplanned diversions to alternative airports and that if the flight attendants' actual or projected flight time exceeds the attendants duty day limits, he or she is entitled to "walk off" (*i.e.*, leave the plane en-route) the aircraft despite the possible unavailability of a replacement flight crew to continue on the flight. According to IUFA, this is a contractual right guaranteed under section 6.E.2, and Pan Am's disciplinary actions in retaliation for such walkoffs endanger the health and safety of the passengers and flight crew. In his affidavit Brian Moreau, the New York Base Chairperson of IUFA indicated that these disciplinary measures forced flight attendants to work beyond their duty day limits, impairing their mental and physical capacity to respond to aircraft emergencies. Pan Am, relying on the language of the provisions, contends that the provisions of section 6.E.2.d. apply only when flight attendants report for duty (*i.e.*, at a "home base") or stop at a layover point and interprets the duty day limitations as not permitting flight attendants to abandon their flights or refuse to work when a flight is diverted downline because of a situation developing subsequent to the initial flight departure or because of an enroute delay.

The duty day limitations contained in the 1985 Agreement first appeared in 1979 in response to flight attendants' claim of fatigue in cases of extremely long duty days.

Although the Federal Aviation Administration ("FAA") set standards for maximum consecutive duty hours of pilots and flight mechanics, none were set for flight attendants, but Pan Am's "Monthly Operating Bulletin" contained a fatigue procedure whereby flight attendants who complained of and who asked to be relieved from a flight would be required to have a conference with a supervisor to substantiate the claimed fatigue and would be required to see a physician for the same purpose. The 1982 Agreement contained a provision which awarded time and one-half pay for each hour over the thirteen hour duty day limit which a flight attendant worked. Flight attendants regularly worked such overtime hours when faced with downline delays or unanticipated diversions. There were, however, occasional refusals to continue on such a lengthened duty day, and no disciplinary action was taken against flight attendants who refused to accept the overtime option. This overtime provision was omitted from the 1985 Agreement negotiated by IUFA and Pan Am in April of 1985 and ratified on August 31, 1985.

Between April and August of 1985 the dispute over the scope of the section 6.E.2.d. duty day limitations escalated, and many flight attendants chose to assert IUFA's interpretation of their contract and exercise their rights to "walkoff" aircraft when or downline delays or diversions caused the actual flight time to exceed the applicable duty day limits. On July 3, Pan Am circulated a memorandum (the "July 3 Memo") outlining its position that section 6.E.2.d. applies only when flight attendants report for a duty period, and does not apply during a flight in the event of a downline delay or diversion enroute. Pan Am articulated its belief that its own interpretation of section 6.E.2.d. would control, and that "walkoffs" in such situations would be "treated as acts of insubordination and handled accordingly." During the months following the July 3 memo, suspensions, discharges and other disciplinary proceedings were instituted against both individual attendants and entire flight crews who exercised IUFA's interpretation of their rights to

"walkoff" aircraft if their flight time exceeded their maximum duty day hours under the Agreement.

One of defendants' claims specifically arises from an instance of such discipline. Ms. Star Hesse, a Pan Am flight attendant and IUFA representative was suspended for a period of thirty days when she intervened in a dispute between Pan Am and certain flight attendants exercising IUFA's "walkoff" interpretation of section 6.E.2.d. Ms. Hesse contacted the FAA as part of this intervention on behalf of the flight attendants, and she was suspended by Pan Am for violating its "Employee Rules of Conduct" by allegedly making false or misleading statements about the company. IUFA charges that this action against its union representative is an unlawful interference with the representational rights guaranteed under the Railway Labor Act and grievances have been initiated with respect to Pan Am's disciplinary proceedings as well as its contract interpretations. After some delay, arbitrators have been selected and proceedings before an Adjustment Board have been scheduled.

### Payments to Induce Waiver of Duty Day Limits and Rest

IUFA also contends that Pan Am has violated the Railway Labor Act and is endangering the health and safety of the flight crew and passengers by offering economic incentives to induce flight attendants to waive their contractual duty day limitations contained in section 6.E.2. and to waive their downline rest time contained in section 6.G.1 of the 1985 Agreement. It is IUFA's position that these inducements to waive reporting stage duty day limits and mandatory rest endanger both the passengers and crew of the aircraft and the flight attendants themselves by prompting flight attendants to work extremely long duty days. The Moreau affidavit documents IUFA's belief that the mental and physical stresses associated with a normal flight, disruptive passengers, cumbersome equip-

ment and turbulent conditions, make these inducements an inappropriate consideration in the individual attendant's decision whether to exceed normal working hours. In June, 1985, IUFA received reports that Pan Am began the practice of offering flight attendants extra hourly payments and other valuable benefits in exchange for waiving their duty day hour limitations when reporting for duty on certain flights.[4] A flight crew scheduled to fly from Hong Kong to San Francisco was given pay equal to double their flight time after waiving their duty day limitations. Pan Am codified its offer of financial incentives on September 6 and 7, in a wire which authorized Pan Am supervisory personnel to offer an extra $100 per hour for every hour worked over the duty day limitation of section 6.E.2.a. or b. and $100 per hour in exchange for waivers of the downline rest provisions contained in section 6.G.1 of the 1985 Agreement. Pan Am made no attempt to secure these waivers by acting through IUFA representatives, despite the fact that IUFA System Scheduling director Anne B. Miltmore cautioned Pan Am official Ed Biland that Pan Am would be acting illegally if it negotiated individual "deals" with flight attendants. IUFA has made no allegations that refusals to accept these financial inducements were met with any disciplinary actions whatsoever.

### *Conclusions*

### Sanctions for the Downline Exercise of Duty Day Limitations

IUFA seeks to enjoin Pan Am from continuing the practice of coercing, disciplining and suspending flight attendants for exercising their right (according to IUFA's understanding of the scope of section 6.E.2.) to "walkoff" flights delayed downline and to enjoin Pan Am from disciplining any IUFA representatives who counsels flight attendants in such matters on behalf of the flight attendants whom they represent.

---

**4.** IUFA has not demonstrated that financial incentives were negotiated between flight attendants and Pan Am representatives in situations of downline delays or diversions to alternate airports.

In order to succeed in its plea for a preliminary injunction, IUFA must establish that this court has jurisdiction to grant such relief under the applicable provision of the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, which governs the contractual relationship between the parties. Jurisdiction to enjoin Pan Am's actions can be established in two ways. First, the plaintiffs can demonstrate that the dispute is considered a "Major" dispute under the Railway Labor Act, and that the court may enjoin one side to prevent a violation of the *status quo* provisions contained in section 156 of the Railway Labor Act.[5] *Detroit and Toledo Shore Line Railway Co. v. United Transport Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). Second, the plaintiff may prove that although the disputes are best characterized as a "minor" dispute under the Railway Labor Act, failure to grant an injunction would prevent the Adjustment Board from giving a significant remedy to the side which prevails before the board. *Local 553 Transport Workers Union of America v. Eastern Airlines, Inc.*, 695 F.2d 668, 674 (2d Cir.1982).

The Railway Labor Act does not use the terms "Major" and "Minor" disputes to determine the jurisdiction of the federal courts to issue injunctions in cases under its statutory umbrella. The Supreme Court introduced these concepts in *Elgin, Joliet & Eastern Railway Co. v. Burley*, 325 U.S. 711, 722–28, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945), and categorized "Major" disputes as those which "relate to disputes over the formation of collective agreements or efforts to secure them" and "Minor" disputes which "contemplate the existence of a collective bargaining agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one." *Id.* at 723, 65 S.Ct. at 1290.

While this test remains the central inquiry in the Major/Minor dispute arena, the Second Circuit has supplemented this inquiry with a more fluid examination of the bargaining relationship of the parties. The Second Circuit has instructed courts to examine the collective bargaining agreement to determine whether a "plausible interpretation" of the agreement would justify the carriers' action. "A dispute is major if the carriers' contractual justification for its actions is 'obviously insubstantial' (citations omitted). On the other hand, a dispute is minor if the contract is 'reasonable susceptible' to the carriers' interpretation." *Local 553, Transport Workers Union v. Eastern Airlines, Inc.*, *supra*, at 673. If the court determines that a dispute is "Minor" (other than in the rare instance of an injunction to insure the Board will be able to award the prevailing party) an Adjustment Board has exclusive jurisdiction to resolve the merits of the controversy under Railway Labor Act Section 204, 45 U.S.C. § 184. *Airline Pilots Association v. Trans World Airlines*, 713 F.2d 940, 949 (2d Cir.1983), *aff'd in part, rev. in part sub nom, Trans World Airlines v. Thurston*, —— U.S. ——, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Applying these standards to IUFA's claims, the controversy over the scope and meaning of the duty day limitations in section 6.E.2. is a Minor dispute under the Railway Labor Act and

---

**5.** Section 156 of the Railway Labor Act reads as follows:

**§ 156. Procedure in changing rates of pay, rules, and working conditions**

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

should be resolved by an Adjustment Board and not by this court.

Measuring this dispute by the *Elgin* standards, the interpretation of the duty day limitation provision is a Minor dispute concerning an already existing collective bargaining agreement and a disagreement over the meaning or proper application of this provision to a specific or omitted case. Indeed, section 6.E.2. (or one of its precursors) has existed as part of the IUFA-Pan Am contractual relationship since its introduction in the 1979 agreements, and has been the subject of negotiation between the parties. Pan Am's interpretation formalized in the July 3 memo, that the duty day limitation provisions of section 6.E.2. do not apply to downline delays or diversions, is at the least a "plausible interpretation" of the provisions.

The language of section 6.E.2.d. (notification) applies by its own terms to a situation in which the flight attendant "reports for duty" at the beginning of a duty day. It is possible to read this "reporting" preamble as limiting the scope of the entire paragraph, including the underlined sentence which prohibits Pan Am from requiring flight attendants to remain on duty in excess of applicable duty day limits. IUFA's contention that Pan Am's interpretation of 6.E.2.d. added a new limiting term for downline delays is a semantic device to satisfy the *Elgin* standard for a "Major" dispute—the formation of creation of new contract provisions.

The plausibility of Pan Am's reading of the duty day limitations appears to be buttressed by the fact that prior to June of 1985, flight attendants routinely flew through downline duty day limitations and were paid time and one-half for those extra hours under the 1982 Agreement. Apparently it was the withdrawal of these overtime payments which precipitated exposure of this ambiguity in the duty day limitations in situations of downline delay or diversion, and caused the flight attendants to exercise IUFA's interpretation of their "walkoff" rights. This bargaining context demonstrates that Pan Am's justification for its interpretation of section 6 is not "obviously insubstantial" and that the duty day limitation controversy remains a Minor dispute under the jurisdiction of the Adjustment Board under the Railway Labor Act.

The use of disciplinary proceedings against flight attendants who exercise downline duty day limits fails to raise the level of this controversy to a Major dispute under the Railway Labor Act. If Pan Am's section 6.E.2. interpretation is a Minor dispute under the Railway Labor Act, then taking disciplinary measures to enforce its interpretation is also a Minor dispute. *See International Ass'n of Machinists v. Northwest Airlines*, 673 F.2d 700 (3d Cir. 1982). In instances of such disagreements between IUFA and Pan Am over the interpretation of a contract provision, the union had agreed to "work now, grieve later," and any refusal to do so was legitimately met with disciplinary sanctions pending mediation of the dispute.[6]

IUFA correctly points out that under limited circumstances courts have issued injunctive orders in disputes considered to be "Minor" under the jurisdictional standards used to determine the scope of the arbitration procedures of the Railway Labor Act. For example, in *Brotherhood of Locomotive Engineers v. Missouri Kansas-Texas Railroad Co.*, 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960) the Supreme Court endorsed the granting of injunctions against a carrier when that injunction "rather than defeating the Board's jurisdiction, would operate to preserve that jurisdiction by preventing injury so irrepa-

---

**6.** The agreement between the parties to "work now/grieve later" was set out in the so-called "Mary Ellen King letter" of May 30, 1978 in which Ms. King, then IUFA President, stated in her letter to Mr. Donald Hunt, Staff Vice-President for Labor Relations, "That is, even if the individual questions an order, policy, or procedure, s/he will "obey now, grieve later." The Company and the Union understand that in the event the individual fails to comply with orders, policies, or procedures as indicated above, the measure of discipline, if any, up to and including discharge, shall be consistent with the nature of the act and the reason for refusal."

rable that a decision of the Board in the union's favor would be but an empty victory." The Second Circuit has endorsed this "empty victory" principle in numerous opinions. *See e.g., Local 533, Transport Workers v. Eastern Air Lines, supra,* 695 F.2d at 675; *Airline Pilots Association v. Trans World Air Lines, supra,* 713 F.2d at 949.

However, the exercise of this power to enjoin actions in the context of "minor" disputes would be inappropriate in this case, because IUFA has not demonstrated that preserving the *status quo* at this juncture would put the Adjustment Board in a better position to repair any damage to the status of IUFA as the flight attendants' bargaining representative which the Pan Am incentives may have caused.

**The Suspension of Star Hesse**

IUFA also claims that the disciplinary measure taken against IUFA's representative and Pan Am flight attendant Star Hesse should be enjoined by this court because it constitutes the unlawful retaliation and interference with representative's rights in violation of Sections 152 Third and Fourth of the Railway Labor Act [7] and thus is outside the scope of the Railway Labor

Act's scheme for dispute resolution through arbitration. Pan Am contends that this disciplinary action is a conventional and Minor dispute arising out of the same disagreement over the meaning of the duty day limitation sections and should be referred to arbitration under the procedures outlined in section 153 of the Railway Labor Act.

IUFA has failed to demonstrate that the discipline of Ms. Hesse was a violation of the Section 152 representational rights guaranteed under the Act, rather than part of the general dispute over the scope and meaning of the duty day limitations in the 1985 Agreement.

Sections 152 Third and Fourth by their own terms apply to the designation and choice of representatives, and section Fourth specifically prohibits employer interference with formation of the labor organization. Courts generally have given limited scope to this special statutory protection for the formation of labor organizations, and have held that section 152 Third and Fourth give limited rights outside the context of a representation contest. *International Association of Machinists and*

---

**7.** Sections 152 Third and Fourth provide as follows:

**Designation of representatives**

Third. Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

**Organization and collective bargaining; freedom from interference by carrier; assistance in organizing or maintaining organization by carrier forbidden; deduction of dues from wages forbidden**

Fourth. Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this

chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce, employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions: **Provided,** That nothing in this chapter shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization.

*Aerospace Workers v. Northwest Airlines, Inc.*, 673 F.2d 700, 707 (3d Cir.1982). In the case of IUFA representative Hesse, no representational contest was involved, and reliance on the protections of Section 152 is misplaced since this dispute is outside the pre-certification context.

█ IUFA contends, however, that invocation of sections 152 Third and Fourth is warranted in this case because the suspension of Ms. Hesse was an attempt to impair her effectiveness as a flight attendants' bargaining representative and that her discipline had a chilling effect on the flight attendants' willingness to exercise their contract rights. While there is authority for the proposition that Section 152 does apply in instances in which employer retaliation or discipline is part of an effort to destroy the effectiveness of the chosen representative, *Brotherhood of Railroad Trainmen v. Central of Georgia Railway Company*, 305 F.2d 605, 609 (5th Cir.1962), there is no evidence to indicate that Ms. Hesse's suspension was different in motivation from the discipline meted out to other flight attendants who disagreed with Pan Am's interpretation of section 6.E.2. On the contrary, the events leading up to her suspension resulted from the same duty day limitation dispute and occurred because of Ms. Hesse's efforts to intervene in one such dispute to aid the flight attendants in the exercise of rights accruing to them under IUFA's interpretation of the duty day limitation provisions. It is Pan Am's belief that Ms. Hesse violated specific sections of the company's "Employee Rules of Conduct" and the company asserted that it had "just and sufficient cause" for disciplining her because she allegedly made false or misleading statements about Pan Am to the FAA during the course of the aforementioned incident. IUFA failed to prove that this suspension was a predetermined effort to "frustrate and undermine the effectiveness of such bargaining agent by securing his discharge for unfounded,

false, or baseless charges." *Id.* at 608. Ms. Hesse's suspension must therefore be considered part of the "Minor" dispute over the scope and meaning of section 6.E.2. and should be handled according to the arbitration provisions of section 153 of the Railway Labor Act.

### Deals With Flight Attendants

█ IUFA claims that Pan Am's offer of economic inducements to flight attendants in exchange for their waiver of duty day limitations at the departure point for the flight [8] or their waiver of mandatory rest provisions at downline crew layover stops was a unilateral change in the terms and conditions of employment contained in the 1985 Agreement. IUFA contends that these individual "deals" with flight attendants thus violated section 152 Seventh of the Railway Labor Act which provides in relevant part that "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees ... except in the manner prescribed in such agreements or in section 156 of this title," and that the courts have jurisdiction to enjoin such violations of the Act. According to Pan Am, nothing in the 1985 Agreement prohibits the company from offering flight attendants incentives to waive their maximum hour limitations and rest periods, and because such provisions are concededly waiveable, the contract preserves Pan Am's right to solicit such waivers. However, an individual negotiation with flight attendants bypassing IUFA representatives on issues of terms and conditions of employment is a Major dispute and violates IUFA's rights under the Railway Labor Act and will be enjoined.

Pan Am's negotiation of private arrangements with flight attendants is a Major dispute under the Railway Labor Act for two reasons. First, bypassing the union with offers of financial inducements to flight attendants unilaterally alters the "rates of pay, rules or working conditions"

---

**8.** There was no dispute between the parties as to the attendants' right to cancel from a flight at its *departure point* if the projected flight time would exceed the maximum duty day limitations contained in section 6.E.2.

of the employees contrary to the dictates of Section 152 Seventh of the Railway Labor Act. The Act prescribes detailed mediation procedures under Section 156 before carriers are permitted to make unilateral changes in rates of pay, rules, or working conditions. These individual "deals" do not present a question of bargaining agreement interpretation as was at issue in the dispute over the scope of the duty day limitations contained in Section 6.E.2. Rather they seek to undermine the existing and bargained-for limits on the working hours and rates of pay for flight attendants. In the language of the *Elgin* formula, these inducements are Major disputes under the Act because "they arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Elgin, Joliet & Eastern Railway Co. v. Burley, supra,* 325 U.S. at 723, 65 S.Ct. at 1290.

Although Pan Am contends that these economic inducements are consistent with its interpretations of the 1985 Agreement, the company offers no "plausible" contractual basis for its belief that the Agreement permits the company to offer individual economic bonuses to flight attendants to solicit waivers of their contractual rights. The bargaining history between IUFA and Pan Am from 1982 to 1985 demonstrates that similar economic incentives in the form of hourly overtime payments existed in the 1982 Agreement and they were specifically excluded from the 1985 Agreement after Pan Am's extensive negotiations with IUFA. It is thus implausible to suggest that raising the same bargaining issue with individual flight attendants was "compatible" with the 1985 Agreement. "Compatibility" according to Pan Am's suggested definition would undermine all of the contractual provisions of the 1985 Agreement, with its philosophy of "If it isn't there, we must be able to offer it."

9. The Supreme Court made these principles equally applicable to actions brought under the Railway Labor Act in *Order of Railroad Telegra-*

In addition, such solicitations of individual "deals" is contrary to the fundamental labor law principle that the solicitation of individual contracts is prohibited when a union is present as the collective bargaining agent of the employees. As the Supreme Court stated in *J.I. Case Co. v. National Labor Relations Board,* 321 U.S. 332, 337, 64 S.Ct. 576, 580, 88 L.Ed. 762 (1944), "Individual contracts, no matter what the circumstances that justify their execution or what their terms, may not be availed of to defeat or delay the procedures prescribed by the National Labor Relations Act looking to collective bargaining ...; *nor may they be used to forestall bargaining or to limit or condition the terms of the collective agreement.*" [9] (emphasis added) Pan Am's construction of the 1985 Agreement would both condition the agreement into non-existence, and would institutionalize a bypassing of IUFA's representatives and a unilateral change in the flight attendants' term and conditions of employment. *See, e.g., Lodge 743, International Association of Machinists, AFL–CIO v. United Aircraft Corp.,* 337 F.2d 5 (2d Cir. 1964). As the Supreme Court reiterated in *National Labor Relations Board v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967) the policy of pooling economic strength and acting through a labor organization "therefore extinguishes the individual employees' power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees." Bypassing IUFA representatives and negotiating individually with flight attendants violates the Railway Labor Act and is contrary to fundamental labor law principles and must be characterized as a Major dispute under the Act.

In addition to meeting its jurisdictional burdens under the Railway Labor Act, IUFA has also met the standards applicable to a plaintiff seeking the award of injunctive relief. In the Second Circuit, a party seeking injunctive relief must show

*phers v. Railway Express Agency, Inc.,* 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788 (1944).

"(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). *Cf., Air Line Pilots Association, International v. Trans World Airlines, Inc.*, 713 F.2d 940 (2d Cir.1983).

■ IUFA has demonstrated that Pan Am's individual agreements with flight attendants will cause irreparable injury to its status as the employees certified bargaining representative. Pan Am deliberately bypassed IUFA representatives with these offers of ex-contractual benefits to flight attendants, conduct constituting a challenge to union strength timed to coincide precisely with the union's negotiation of what was concededly a "concessionary" collective bargaining agreement with Pan Am. As the Supreme Court stated in *J.I. Case Co. v. National Labor Relations Board, supra*, 321 U.S., at 338, 64 S.Ct. at 580:

> But except as so provided [by express provision in the collective bargain to leave certain areas open to individual bargaining], advantages to individuals may prove as disruptive of industrial peace as disadvantages. They are a fruitful way of interfering with organization and choice of representatives; increased compensation, if individually deserved, is often earned at the cost of breaking down some other standard thought to be for the welfare of the group ... Such discriminations not infrequently amount to unfair labor practices.

IUFA has demonstrated that irreparable injury also may result from Pan Am's efforts to induce flight attendants to waive the contractually set limits on the number of consecutive hours which they must work. As the Moreau affidavit detailed, flight attendants who work extremely long duty days are less able to respond to aircraft emergencies and are less able to handle the physical and mental stresses of a normal flight. The risk of such injury is increased by Pan Am's tactic of negotiating "on the spot" waivers with flight attendants whenever they are needed, injecting an element of urgency into a health and safety calculus which should measure flight attendant fatigue. As was discussed above, IUFA has more than demonstrated its likelihood of success on the merits of its claim to enjoin Pan Am's practice of offering financial incentives in exchange for the waiver of contract provisions, and has thus met both requirements for the granting of injunctive relief.

For the foregoing reasons, Pan Am is preliminarly enjoined from negotiating individual waivers of duty day limitations or rest periods as provided in the 1985 Agreement pending final resolution of the dispute at trial. The remaining claims for preliminary injunctive relief are denied.

IT IS SO ORDERED.