**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Plaintiff,**

v.

**The FLYING TIGER LINE, INC., Defendant.**

No. 87 C 0972.

United States District Court, E.D. New York.

May 4, 1987.

Cohen, Weiss and Simon, New York City, Peter Herman, Michael Winston, of counsel, for plaintiff.

O'Melveny & Myers, Robert A. Siegel, Jeffrey I. Kohn, of counsel, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff Air Line Pilots Association, International (ALPA) brought this action under the Railway Labor Act (the Act), 45 U.S.C. §§ 151–188, against The Flying Tiger Line, Inc. (Flying Tiger), seeking an injunction, a declaratory judgment, and damages. ALPA has moved for a prelimi-

nary injunction. Both parties have submitted affidavits.

ALPA, a labor union, is the bargaining representative for the Flying Tiger pilots and has negotiated on their behalf successive collective bargaining agreements with Flying Tiger. The present agreement, effective as of July 1, 1984, is not subject to modification prior to July 31, 1987, except by further agreement.

On November 27, 1986 the parties signed a memorandum of understanding modifying the agreement to include an immediate 25% wage reduction. In addition the memorandum provides for "modification of work rules and benefits" effective January 1, 1987 to achieve a further $10 million in annual cost savings. The selection of the rules and benefits was to be determined by ALPA and their valuation to be by mutual agreement or a mutually acceptable impartial person. If sufficient modifications were not implemented by January 1, 1987 to achieve those savings, Flying Tiger would further reduce wages to the extent needed to do so. No modifications were implemented on January 1, 1987, and in accordance with the memorandum Flying Tiger further reduced wages by 13%.

Beginning in January 1987 the parties attempted to negotiate work rule and benefit modifications that could replace the 13% wage cut. The parties agree that negotiations broke down on March 11, 1987. They differ as to why. Flying Tiger says that Captain Garry Duff, ALPA's chief negotiator, refused to discuss modifications proposed by Flying Tiger on March 4, 1987, unless the terms of the memorandum were changed to include a rescission of a significant portion of the initial 25% wage reduction, a rescission unacceptable to Flying Tiger.

ALPA admits it received on March 4, 1987 Flying Tiger's proposed modifications but says that Flying Tiger then refused to consider ALPA's "counterproposal" made on March 11, 1987. ALPA does not describe the counterproposal other than to say that it included "explicit consideration of the work rule and benefit modifications." ALPA does not deny that it sought a rescission of a significant part of the initial 25% wage reduction.

On March 12, 1987 Duff recorded a message on "NOTAMS," a system maintained by ALPA to enable Flying Tiger pilots to call and hear a tape recorded message about, among other things, the status of labor negotiations. Duff's message stated, in pertinent part, that Flying Tiger had terminated the negotiations, that the negotiating committee did not agree with Flying Tiger's "decision to discontinue these meetings," and that ALPA's position was maintained and presented consistently since January 1987, namely, to "offer to grant all appropriate operational relief through temporary work rule changes for 1987 in exchange for a reduction of the economic damage inflicted on our pilot group as a result of" the November 27, 1986 memorandum.

Flying Tiger asserts that this message distorted what had occurred at the negotiations because it did not reveal that ALPA had refused to discuss work rule changes unless a significant part of the 25% wage reduction was immediately rescinded. Charles W. Thomson, Flying Tiger's Vice President-Human Resources, then, "[t]o set the record straight," sent Duff a letter dated March 17, 1987, with a copy to each Flying Tiger pilot under a cover letter.

The letter to Duff states, in substance, that Thomson is "disappointed in your response to our efforts to deal seriously on the issue of returning the 13% pay reduction to our pilots," that the changes proposed by Flying Tiger "could have returned some, or all, of the alternative 13% salary reduction," that "[y]our refusal to even discuss work rules or costs has unfortunately caused the breakdown of negotiations" and placed a "roadblock in the way of restoring a significant portion of income to pilots," that Duff continues "to mislead your constituents regarding negotiations," and that the "party who has not put forth even one proposal and places a huge boulder on the road to an agreement can hardly accuse the other of terminating negotiations." The letter closes with a request to Duff to "reconsider your position and work

with us to restore some, or all, of the 13% to our pilots." Enclosed with the letter is a three page memorandum setting forth Flying Tiger's March 4, 1987 proposed work rule and benefit changes.

Thomson's letter to the pilots recites that a copy of the letter to Duff, "your Chief Negotiator," and the Flying Tiger proposal were enclosed, that each pilot had "a right to know what caused the breakdown," that Thomson had "listened to Captain Duff berate a great many people during the past 13 weeks," that "the vindictive comments are really getting old" and are "not productive," that dealing with only a few of the items in Flying Tiger's proposal "can return significant dollars to your paycheck," and that Thomson "cannot understand Captain Duff's refusal" to achieve cost reductions "for you." The letter ends with the hope that Duff "will change his position."

On March 24, 1987 ALPA wrote Thomson claiming his letter to the pilots was an attempt to bypass and undermine ALPA and to negotiate directly with the pilots, and demanding a retraction. On March 25, 1987 Thomson responded that Flying Tiger had no intention to bypass ALPA and negotiate directly with the pilots and that his letter to the pilots was "merely a report on what has transpired in negotiations."

ALPA contends that Thomson, by sending the letter and its enclosures to the pilots, violated various subsections of section 2 of the Act, 45 U.S.C. § 152. That section provides, so far as relevant, that it is the duty of a carrier "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes," 45 U.S.C. § 152, First; that disputes between a carrier and its employees "shall be considered, and, if possible, decided, with all expedition, in conference between representatives" designated by the parties, 45 U.S.C. § 152, Second; that representatives shall be designated "without interference, influence, or coercion" by either party, 45 U.S.C. § 152, Third; that no carrier shall "interfere in any way with the organization of its employees," who have "the right to organize and bargain collec-

tively through representatives of their own choosing," 45 U.S.C. § 152, Fourth; that no carrier "shall change the rates of pay, rules or working condition of its employees" except in the manner prescribed by the Act or the applicable bargaining agreement, 45 U.S.C. § 152, Seventh; and that the carrier "shall treat" with the duly certified representative of its employees, 45 U.S.C. § 152, Ninth.

ALPA claims that Flying Tiger by communicating directly with the pilots embarked on a program to undermine the ALPA negotiators and interfered with the right of the employees to negotiate through their representative.

■ The Act contemplates that disputes between a carrier and its employees are to be discussed and, if possible, settled by the "representatives" of the parties. *Chicago & North Western Railway v. United Transportation Union*, 402 U.S. 570, 574–75, 91 S.Ct. 1731, 1733–34, 29 L.Ed.2d 187 (1971). Hence an employer may not disregard the employees' designated representative and negotiate private arrangements directly with the employees. *Independent Union of Flight Attendants v. Pan American World Airways, Inc.*, 620 F.Supp. 447, 456–57 (S.D.N.Y.1985), *aff'd*, 789 F.2d 139 (2d Cir.1986) (*per curiam*). To do that would frustrate the purpose of the legislation to induce the settlement of disputes through negotiation between parties, each presumably of significant bargaining power.

■ But the Act does not in terms prohibit an employer from issuing any communication to its employees regarding collective bargaining issues. Nor have judicial decisions read such a prohibition into the Act. Indeed, the First Amendment allows the employer some scope to bring its views to the attention of its employees. *Independent Federation of Flight Attendants v. Trans World Airlines, Inc.*, 94 Lab.Cas. (CCH) ¶ 13,635 (W.D.Mo.1981); *cf. NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969) ("an employer's free speech right to communicate his views to his employees is firmly established" under the National La-

bor Relations Act). Of course, any such message from the employer, if it questions the position, factual or otherwise, of the employees' representative, is designed to have, and presumably has, some effect on the bargaining process and may raise questions in the minds of the employees as to the validity of their representative's bargaining position. However, only if the communication is couched in such terms as to give the impression, explicitly or impliedly, of an unwillingness to deal fairly with that representative can the employer be said to be interfering with the employees' statutory right to bargain through its chosen representative.

This court can, of course, issue an injunction to require the parties to fulfill their obligations under the Act. *Virginian Railway v. System Federation No. 40*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937). But there is little judicial authority addressing the question of when an employer's communication to its employees has crossed the line into unlawful interference with their right under the Act to bargain through their representative.

In fact, the only case under the Act cited by the parties and focussing on that issue is *Independent Federation of Flight Attendants v. Trans World Airlines, Inc., supra*. There the carrier wrote to the employees describing its position at bargaining sessions with the unions as its "program" and stating that because of industry conditions there was a need to cap labor costs and increase productivity. The letter also said that the "program" included a profit sharing plan of unspecified dimensions, though this had not been broached to the unions. The unions protested that the letter was an attempt to undermine negotiations and requested assurance of compliance with bargaining procedures. The carrier gave such assurances, but asserted its right and responsibility "to advise employees of the facts and our plans in a timely way."

The court said that the letter was not "a part of any all-out campaign to disrupt negotiations or destroy the union's bargaining power" and declined to prohibit further

communication by the carrier with the employees concerning the terms of future employment. The present case is roughly comparable.

While decisions determining what is an "unfair labor practice" under the National Labor Relations Act are not precisely in point, they may be used as some assistance in establishing the extent of Flying Tiger's duty here. *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).

ALPA relies particularly on *NLRB v. General Electric Co.*, 418 F.2d 736 (2d Cir.1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970). There the majority held, Friendly, J., dissenting, that the National Labor Relations Board properly found that General Electric had committed an "unfair labor practice" where it had combined a "take-it-or-leave-it" bargaining method with a stance, widely publicized to its employees, that it believed in the firmness of its offers "for the sake of firmness" so that it was "unable to alter a position once taken." *Id.* at 762–64. General Electric had engaged in what was called "Boulwareism," presenting its "final offer" to its employees (and the public) through "a veritable avalanche of publicity, reaching awesome proportions prior to and during negotiations," *id.* at 740, and utilizing "a vast network of plant newspapers, bulletins, letters, television and radio announcements, and personal contacts through management personnel." *Id.* at 741. The court held that these communications, made "as though the Union did not exist," constituted an absence of good faith bargaining. *Id.* at 762–63.

The present case is hardly comparable. Flying Tiger's one letter is not an avalanche. Moreover, that letter recognizes the existence of the union and its role in the bargaining process.

The case cited by ALPA most nearly in point is *Safeway Trails, Inc. v. NLRB*, 641 F.2d 930 (D.C.Cir.1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980). There the union did not present the employer's proposal to the employees. The

employer thus sent a copy to each employee with a letter blaming the union's chief negotiator, Lantz, for failure to reach agreement and asking each employee to "act in the interest of [his] own personal welfare and aid in getting an early settlement." The employer then sent a "complete contract document" to all employees, stating that it was the company's "final offer." Company officers also orally informed employees that they were "following the wrong man" and that the company could settle the contract "within two to three hours" by meeting "any three men on the roster other than" Lantz. The National Labor Relations Board found that these actions constituted an unfair labor practice, and the court affirmed.

In that case the employer went so far as to suggest to the employees that some one other than the representative chosen by the employees should conduct the negotiations. In the present case Flying Tiger's letters recognize that it must deal with Duff and the ALPA negotiating committee.

■ The principle that governs this case is clear. The employer must not say things directly to the employees that suggest an intention not to deal in good faith with their representative. That suggestion may be made explicitly, as in the *Safeway Trails* case, or may be inferred from the context in which the employer speaks, as in the *General Electric* case. But such an inference is not justified by the mere fact that the employer reports to the employees its version of what was said at the bargaining sessions or asks them to consider the validity of its proposals or to suggest to their representatives the position they should take. Nor does criticism of the employees' representative imply a refusal to bargain, unless, of course, that criticism is so virulent or extensive as to cast serious doubt on the feasibility of further good faith discourse.

■ In the present case the Flying Tiger letter to the employees betrays Thomson's personal resentment of Duff's attitude and to that extent is not a useful contribution to the bargaining process. But the employees can hardly conclude from the letter

that Flying Tiger will not treat with Duff or with his negotiating committee or that they have lost their effectiveness as a bargaining representative. ALPA is thus not entitled to an injunction at this time.

If Flying Tiger sends further communications to the employees that, taken together with what has already been issued, fairly give rise to an inference that Flying Tiger intends not to negotiate with the committee, ALPA will be free to apply to this court for appropriate relief.

■ ALPA also urges that Thomson's letter breached a January 22, 1987 "news blackout" agreement as to the negotiations. Flying Tiger says that the NOTAMS message violated the agreement. Whether there was a breach by either party is a "minor dispute" committed under the Act to the System Board of Adjustment and not to the court. *Union Pacific Railroad v. Sheehan,* 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978).

The motion for a preliminary injunction is denied. So ordered.